# ALBANY & SANTIAM W. D. Co. *v.* CRAWFORD.

DEED WHEN A MORTGAGE—PAROL EVIDENCE.—A deed absolute on its face may be shown by parol evidence to have been intended as a mortgage. Such evidence must be clear and satisfactory, and sufficient to overcome the presumption that the instrument is what it purports to be.

EVIDENCE REVIEWED, AND THE DEED IN QUESTION held not to be a mortgage.

APPEAL from Linn County.

*Powell & Bilyeu* and *Bonham & Ramsey*, for the appellant.

*Flinn & Chamberlain* and *R. S. Strahan*, for the respondent.

By the Court, WATSON, C. J.:

This is a suit in equity to have a deed absolute on its face declared a mortgage, in accordance with an alleged intention of the parties.

The deed was executed April 21, 1876, and the complaint was filed April 4, 1881. All the property of the appellant, both real and personal, including The Albany and Santiam Water Ditch or Canal, with its right of way, water privileges, etc., several small tracts of land, and a boat called "Red Jacket," situated in Linn county, is covered by the deed. Possession accompanied the execution of the deed to respondent. He paid thirty-three thousand nine hundred dollars. Appellant claims that this was a loan merely, and that the deed, although absolute in terms, was only intended as a mortgage.

This is disputed by the respondent, who insists that the transaction was in fact what on its face it purports to be, an absolute and unqualified sale. This seems to us the only material issue in the case. And it is one of fact simply, to be determined by the evidence in the record. There is no controversy over the proposition of law involved in the very institution of the suit itself, that a deed absolute in terms may be shown by parol evidence to have been intended as a mortgage in a court of equity, and such intention preserved and effectuated. But the evidence to justify this interposition should be clear and satisfactory. (2 Whar. Ev., 1032.)

The presumption is that the transaction was, in fact, an absolute conveyance, just as it appears from the face of the deed to have been, and it is one of no little weight either. The great amount of evidence in the case renders any detailed examination impracticable, as it certainly would be

unprofitable.   A general analysis is all that will be attempted.

A noticeable feature of the appellant's case is the entire absence of any direct evidence of the alleged agreement by the respondent to loan it the money and take the deed for his security.   Not a single witness has testified to a personal knowledge to such fact or named the party making such an agreement with Crawford on behalf of the company.   Here was a large corporation engaged in an extensive and costly enterprise with its capital stock of thirty thousand dollars all paid up, and expended in the prosecution of the work, and an indebtedness of thirty-three thousand dollars incurred in completing it still hanging over it, a board of seven directors and a large membership of stockholders deeply interested in the company's affairs, and most, if not all, residing in the immediate vicinity of the company's principal office or place of business at Albany, Linn county, this state, and yet not a particle of direct testimony as to the alleged agreement on Crawford's part, that is, to convert the deed absolute on its face and including all the company's property into a mortgage.   Every one of the directors, save D. M. Thompson, who had deceased when the testimony was taken, and a majority of the stockholders have testified in the case, but not one of the whole number attempts to give the time or parties when, where, or with whom Crawford entered into the alleged agreement.

The only proof the company offers upon this vital issue consists of declarations made by Crawford, and the "understanding" the individual members of the company had as to the character of the transactions at the time, and the opinion of the witnesses as to the "general understanding" of the company at the time in respect to the matter.

Luther Elkins is the only witness for the company who

testifies to declarations made by Crawford before the sale. The precise bearing and real value of his testimony cannot be properly estimated without a brief reference to previous events leading up the sale and disclosing its inducements, as well as his subsequent conduct.

The company was incorporated January 28, 1871, for the purpose among others of constructing and operating the water ditch or canal described in Crawford's deed. This work was completed in 1874, but, as already stated, leaving the company largely in debt. About twenty-two thousand dollars of this indebtedness was held by six or seven of the stockholders, of whom Elkins was one, and was secured by mortgage on the ditch and other property of the company. In 1873, and again in 1875, the company sought to raise the necessary funds to liquidate this indebtedness by increasing the amount of its capital stock, but apparently without avail. On January 11, 1876, the board of directors ordered a meeting of the stockholders, called for February 25, ensuing, to consider a proposition to sell the property to pay such indebtedness, divide any surplus, and dissolve the corporation. The stockholders met accordingly, and by a vote of one hundred and twenty-two to two authorized the sale, but requiring that it should be at public auction, and upon four weeks' notice. Before taking the action, however, the meeting rejected this proposition by Elkins to accept additional subscriptions to the capital stock, upon certain designated terms, and to issue and sell bonds of the company, secured by a first mortgage on its property, to raise the necessary funds to meet its obligations.

The board of directors therefore gave notice of the sale by publication for four weeks in "The State Rights Democrat," a weekly newspaper published at Albany, and fixed the time at 1 P. M., April 15, 1876. At this sale, the direct-

ors and stockholders were generally present.   Crawford did not make his appearance until about three o'clock, and the property was not offered until his arrival.   Elkins says that Crawford came to the court house where the sale had been advertised to take place about half past three o'clock, and seeking him out, told him he desired to talk with him. That they walked back into the court house, behind the stair-case together, and Crawford then told him he was about to loan the company a sufficient amount of money to pay the debts, and asked him what amount the company owed.   That he told him upwards of thirty thousand dollars, perhaps thirty-two thousand or thirty-three thousand, but he could not tell him precisely—it might be a little more or a little less.   That Crawford repeated that he had agreed to loan the company money necessary to pay its debts; that the time was five years, and as much longer as the company desired—to keep it as long as he lived, for that matter.   That he further said the ditch and property were to be turned over to him as security, and he was to have the income to pay his interest, and that the company were his old friends and neighbors, and had done a great work, both for Albany and the whole country, and he would sooner they should have the money than others.   That Crawford said just as they were about to separate, if he bid upon the property at all he would bid it in for the company, and that upon that agreement he went with Crawford to the door, and that in a few minutes the property was put up for sale and bid off by Crawford.

This is the only declaration by Crawford operating as an admission of an agreement by him to loan the money bid at the sale to the company, and take the deed as a security for its repayment, made prior to the sale, that the company has offered any evidence to prove.

Crawford denies having any conversation whatever with Elkins before the sale, and upon this point he is strongly corroborated by Allen Parker, a director of the company, who was also present at the sale.

But Crawford admits that he did talk with Elkins after the sale, and told him if he formed a new company and could not dispose of all the stock he, Crawford, would sell them the property and take five thousand dollars of the stock in the new company.

Elkins, himself, bid thirty-three thousand eight hundred dollars on the property, or within one hundred dollars of the price at which it was knocked off to Crawford.

J. F. Backensto, a director of the company at the time, and one of its most important witnesses in this suit, says that Elkins came to him after Crawford had made his last bid, and asked him if that would cover the debts. And that upon his replying that "it would and more too," Elkins smiled and said, "that is all 1 want." Jason Wheeler, also a director, but a witness for Crawford, says that Elkins asked him during the sale if he thought Crawford would give any more. That if he, Wheeler, thought so, he, Elkins, would raise him another hundred. That he told him he might try, as Crawford might bid higher, but Elkins concluded not to do so, giving as his reason, that Crawford might let him take the property and that would ruin him, as he could not raise the money to pay for it. Now it is plain from the testimony of Elkins himself, that if any loan was contemplated by any one at the time of the alleged conversation with Crawford, that no amount had been settled upon. If he is to be credited, Crawford designed to advance only money enough to pay off the debts which he then and there informed him amounted to from thirty thousand to thirty-three thousand dollars, possibly a little more

or less. Yet Crawford is not shown to have manifested any surprise at finding Elkins bidding against him and offering eight hundred dollars more for the property himself than he had only a few minutes before told Crawford would be sufficient to pay all the debts. He promptly raises Elkins one hundred dollars more, although he must have known or believed, if Elkins' testimony is to be taken without any allowance, that he was loaning the company nine hundred dollars to pay its debts with, more than would be necessary for the purpose.

It appears that J. H. Foster and A. B. Morris, also stockholders, were present at the sale and bid upon the property.

The company's own witnesses, Backensto and Philip Baltimore, say they supposed all these bids by Elkins, Foster and Morris, were made in the interest of the company and to prevent a sacrifice of the property. And this is the only reasonable explanation of the circumstance. But if Crawford was simply advancing the money he bid upon the property as a loan to the company, such a precaution would seem entirely needless. Nor is there any explanation as to the disposition of the surplus realized by the company on Crawford's bid over the amount needed for the payment of its debts.

But Elkins' object in bidding and consequently his understanding of the transaction at the time, is clearly shown by the testimony of Backensto and Wheeler as to what he said to them during the sale, which has already been adverted to. He had an interest in the company's property selling for the highest price obtainable, both as a joint holder of the mortgage upon it and as a stockholder. He owned fifteen shares according to his own testimony, And he bid against Crawford just as long as he dared, to advance his own interest. But this is not all. On April twenty-seventh, just

twelve days after the sale to Crawford, Elkins commenced a suit against him and the directors of the company, as a stockholder, to set the sale aside for fraud and collusion between him and a portion of the directors detrimental to the interests of the company and the rights of the stockholders. In the complaint in such suit, which Elkins himself verified, there is not a word indicative of any belief on his part that Crawford had loaned the money bid by him at the sale and taken the deed as a security. And, although that suit was withdrawn by Elkins, it was not until after the board of directors, at a meeting held October 14, 1876, had adopted a resolution making provision for a final settlement between the company and himself, one of the conditions of which was that he should withdraw the suit and "ratify and consent and confirm the sale mentioned in said suit made by the said company to John A. Crawford." Elkins complied with a large portion of this requirement on the next day, as appears by an entry on the margin of the company's record, showing the confirmation of the sale by the board of directors, as follows:

"I, Luther Elkins, one of the stockholders of the Albany and Santiam Water Ditch or Canal Company, hereby ratify, approve and confirm this sale to John A. Crawford of the property of the said company, made on the 15th day of April, 1876, to said John A. Crawford, for the sum of thirty-three thousand nine hundred dollars, and hereby expressly waive and withdraw all objection that I had or may have thereto. Attest, October 15, 1876. (S'd.) L. Elkins." April 22, 1876, Allen Parker, Frank Parton and Lawrence Flinn filed articles of incorporation in the clerk's office of Linn county under the name of The Albany and Santiam Canal Company. One object expressed in the articles was the purchase of the ditch or canal from Crawford, and its operation

both as a ditch and canal. The capital stock was fixed at thirty-four thousand dollars. Parker and Flinn at least were members of the old company. At a subsequent meeting of the board of directors of the old company, October 3, 1876, a committee was appointed to wait on Crawford and ascertain upon what terms he would dispose of the property described in his deed from the company. To this committee, composed of J. H. Foster and D. M. Thompson, since deceased, Crawford delivered a written proposition, which was reported to the board. In this, he agrees to sell the property to any new company "formed or to be formed" out of the membership of the old company with a capital stock of not less than thirty-four thousand dollars, for the sum of thirty-four thousand dollars, and, if necessary, take four thousand dollars of the stock himself, but required the whole amount of capital stock to be subscribed within six months from the date of the proposition.

Another company was incorporated December 31, 1877, by Jason Wheeler, J. H. Foster and Luther Elkins, all members of the old company, under the name of "The Albany and Santiam Canal Company." One of its objects was the purchase and operation of the same property. Its capital stock was thirty-five thousand dollars.

It also appointed a committee consisting of Wheeler and Elkins, two of the directors at the first meeting of the board, to solicit a proposition to sell the property to such new company from Crawford. This committee made a written report to the board of directors, March 7, 1878, to the effect that Crawford would sell and convey to the new company, for thirty-five thousand dollars, ten per cent. down and the balance in nine equal semi-annual payments, bearing ten per cent. per annum interest. A resolution was at once passed accepting the proposition, and the president and sec-

retary ordered to collect ten per cent. of subscriptions for capital stock and to issue certificates to those paying in full. But nothing more seems to have been done. The course pursued by the old company on October 3, 1876, as well as that adopted by the new company on March 7, 1878, plainly contradict the claim now set up by the former, that the transaction of April 15, 1876, was a mortgage and not a sale. If it had been a mortgage, the old company would certainly have been aware of the fact at that time, and would have known just what it had to do to redeem without sending a committee to Crawford to find out. And the board of directors of the new company, including Elkins and C. P. Burkhart, another important witness for the old company in this suit, with all the knowledge they must be charged with of the rights of the old company in the property of the transaction of April 15, 1876, was not, in fact, an absolute sale, can hardly justify their conduct in trying to obtain the legal title from Crawford, when they knew the equitable title was still in the old company.

And it is not a little remarkable upon appellant's theory, that Crawford should not only dictate his own terms of sale and conveyance, but be solicited to do so by the old company within the period of six months from the original transaction.

And it is to be observed that in no instance does Crawford agree to sell or convey to the old company. It is always to a new company formed out of the membership of the old. As he, in each instance, proposed to let the property go on credit to a great extent, and at one time to even take a large share of capital stock if found necessary, it is probable he was not entirely satisfied with the form or membership of the old company, or was apprehensive that some difficulty might still arise out of some of its past trans-

actions, which could not be foreseen and provided against. But whatever may have been his reasons, his conduct on both these occasions clearly indicate his determination not to sell or convey to the old company, the only party entitled to it, upon the hypothesis of the deed having been intended as a mortgage.

But no reason whatever is shown for adopting this circuitous, clumsy, expensive and uncertain mode of mortgaging the property, if a mortgage really was intended.

There were no advantages in it, if that was the true character of the transaction, for either Crawford or the company, to counterbalance the inconvenience and expense attending it. Several members of the company, both directors and stockholders, at the time of the sale to Crawford, have testified that it was their understanding, and that if the company, at the time that Crawford was to loan the money needed to pay the debts of the company, and take a deed of its property as security, and that the sale to Crawford was merely in execution of such agreement.

An equal number, at least, of the directors and stockholders, with the same interests and opportunities for knowledge on the subject, have testified that they had no such understanding, and that no such understanding on the part of the company ever existed, and that they never heard of such a thing prior to the sale, but, on the contrary, supposed the sale absolute and to be so understood by all.

But such an understanding, no matter how general, with members of the company or even with the company itself, nor how clearly proved, would not establish any agreement on Crawford's part. It has not been shown nor is it claimed on the part of the company that Crawford had any direct communication with the board of directors on the subject.

He is not shown to have been present at any meeting of

the board of directors or of the stockholders, nor is there one word in the record of the proceedings of any such meeting indicating that a proposition by Crawford to loan the company money to pay its debts was ever made.

Nor is there any oral testimony in the case tending to show that such a proposition was ever officially considered and acted upon at any such meeting.

It is intimated, however, in the evidence of some of the witnesses for the company, who testify to the existence of such an understanding, and as accounting for it, that the arrangement was made with Crawford through a committee appointed by the board of directors for the purpose. The appointment of such a committee is certain, and its composition is not questioned. It consisted of J. H. Foster and D. M. Thompson. Foster is a witness in the case and his testimony is that Crawford flatly refused to make any loan whatever to the company. Thompson, as already stated, died without having given his testimony in regard to the matter. Yet Allen Parker, a director at the time, testifies that he was present when this committee reported to the board of directors, and that they only stated that Crawford might bid on the property if offered for sale, but they were not positive even as to that; it was only their supposition.

Crawford's testimony on this point is fully corroborated by that of Foster and Parker. There is no evidence to the contrary. And as this committee is the only agency on the part of the company suggested by its counsel, through which the alleged agreement between Crawford and itself for the loan of the money to pay its debts could have been entered into, the conclusion is irresistible that no such agreement was ever made. Counsel for the company argue that the existence of a general impression among members of the company that Crawford was going to loan it the

money needed to pay the debts, denotes that an agreement had been entered into for the purpose. It would not be admissible as legal evidence in a case like the present, certainly, yet as a logical deduction purely it might be entitled to some consideration.

But, even on the latter basis, it would be necessary to determine accurately what the term company signifies in this connection. Does it stand for the company itself in its corporate character, or merely for the aggregate of its individual members? The significant fact that an equal number of the members of the company, including three of the six directors, testify in the case, had no such "impression" or understanding, and had no knowledge of any such on the part of the company, nor even heard of such a thing until after the sale, strongly, if not conclusively, sustains the latter hypothesis. It must, we think, be held sufficient in connection with the other testimony in the case to establish the fact that whatever agreement or understanding existed on Crawford's part as to loaning the money to pay off the debts of the company, was wholly between the individual members and himself, and not made with nor designed for the benefit of the corporate body. And this is not only in harmony with Crawford's testimony and conduct throughout, but in perfect accord with the proceedings of the company itself, as well as the action taken by its members in their individual capacities after the sale.

And it furnishes the key to the true meaning of Crawford's subsequent declarations as to the character of the transactions which have been testified to by not less than twelve witnesses for the company. These declarations are connected in many instances with the warmest professions of sympathy and friendship for the "company" as being his old friends and neighbors, whom he expresses himself as

willing to favor to the utmost extent. Thus qualified and explained, they appear rather as acknowledgements of a moral than of a legal obligation, dependent upon his generosity towards individual members, and having no regard to the interests of the company itself.

Yet still he repeatedly speaks of these old friends and neighbors as the company throughout these declarations, and the mere form of the expression considered by itself as favorable to the company's claim in this suit, but as explained by the conduct of all parties and the numerous significant circumstances of the case before alluded to, no advantage to the company results from it.

No doubt Crawford's friendship for the company influenced him materially in making the purchase.

Nor is there any more doubt that he intended at the time to grant them the privilege of redeeming the property upon the terms of repaying him the amount of his bid and interest.

But the company itself was not to have the privilege, but its members through some new organization. It was not a binding obligation on him in favor of anyone, but to the extent that it was assumed, the facts already given show that he faithfully offered to perform it. The attempt of the company to show inadequacy of consideration fails when it is made to appear by indisputable proof that the income from the property under a management not impeached since he obtained control of it, has not equaled the lowest rate of interest on the amount paid. And if the property was as valuable then as it is now claimed to have been, it seems probable the new company would have made its acceptance good and taken it in 1878. We find no error.

The bill is dismissed; the decree is affirmed.