Argued July 23, decided October 13, 1908.

## ELLIOTT v. BOZORTH.

[97 Pac. 632.]

Appeal and Error — Undertaking — Sufficiency — Signature of Appellant.

1. Under Section 550, B. & C. Comp., providing that the undertaking of an appellant shall be given with one or more sureties, etc., appellant need not sign an undertaking on appeal; and, where a joint notice of appeal is signed by each appellant by their attorneys, and a joint undertaking on appeal is executed by one of the appellants and sureties, a joint appeal is perfected, as against the objection that the other appellant did not sign the undertaking.

Same—Joint Appeal—Transcript.

2. On a joint appeal one transcript is sufficient.

Mortgages—Absolute Deeds as Mortgages—Parol Evidence.

3. A deed absolute on its face may be shown by parol to be a mortgage.

Same—Presumptions.

4. The burden of showing that a deed was intended as a mortgage rests on the one who asserts that fact, which must be shown by clear and satisfactory evidence.

Same.

5. The rule that, where the result of the evidence on the issue whether a deed, absolute on its face was a mortgage, is to produce doubt, the courts incline to construe the transaction to be a mortgage, applies where there is an agreement to reconvey.

Same—Intention of Parties.

6. Whether a deed absolute on its face was intended as a mortgage, depends on the intention of the parties as determined from a consideration of the circumstances, the pecuniary relation of the parties, their previous negotiations, their contemporaneous acts and declarations, and subsequent acts and admissions.

Same.

7. On the issue whether a deed absolute on its face was intended as a mortgage, the subsequent acts and admissions of the parties must be considered as evidence corroborative of a previously existing intent shown to exist.

Trusts—Resulting Trusts.

8. A mortgagor to save foreclosure costs, conveyed the premises to the mortgagee, who gave to the mortgagor an option to repurchase within a specified time. After the expiration of the option, the mortgagee executed

a bond for deed to a third person. The mortgagor who induced the third person to purchase did not assume any obligation to pay the consideration or any part of it. *Held,* that the mortgagor had no equitable interest in the contract of purchase.

FRAUDS, STATUTE OF—SALE OF LAND — CONTRACT — ABANDONMENT — NECESSITY OF WRITING.

9. A written contract to convey land may be abandoned by parol.

MORTGAGES—ABSOLUTE DEEDS AS MORTGAGES—EVIDENCE—SUFFICIENY.

10. Evidence *held* not to show that a deed absolute on its face was a mortgage.

From Tillamook: WILLIAM GALLOWAY, Judge.

Statement by MR. COMMISSIONER SLATER.

Plaintiff and his father, Francis N. Elliott, were joint equal owners and tenants in common of 145.52 acres of land, situate in Tillamook County, about 8 or 10 miles west of the City of Tillamook. On October 20, 1898, they jointly morgtgaged this land to defendant Waterman, to secure the payment of a loan of $475, made by him to plaintiff, which was evidenced by their joint and several note of the same date, payable two years after date, with interest at the rate of 10 per cent per annum, payable annually. About the time or shortly after the maturity of the debt, Francis Elliott, Sr., died intestate, his interest in the land devolving upon his three sons, including plaintiff, and two daughters. In December, 1900, nothing having been paid on the debt, Waterman directed foreclosure proceedings to be brought, if the debt was not paid. But, by a mutual arrangement between Waterman and plaintiff, such proceedings were deferred, to give the latter an opportunity to procure from his brothers and sisters a conveyance of their interests to him, so that he might sell the place, and save something for himself, or, on his failure to sell, convey the same to Waterman in settlement of the debt. By July 2, 1902, plaintiff had procured conveyances from all of his brothers and their wives, and from his two sisters and the husband of one, but not from one Henry Ruhl, husband of the other. Plaintiff, however, had failed to consummate any sale, and on July 21, 1902,

he executed and delivered to Waterman's attorney at
Tillamook City, a general warranty deed purporting to
convey the land to Waterman for the consideration of
$365, expressed therein, that sum being the amount of
the debt on October 20th of that year.   On July 28th
Waterman, at Baker City, executed and forwarded to
his attorney at Tillamook, for delivery to plaintiff, to-
gether with plaintiff's note, an option to repurchase the
same within one year from October 1, 1902, for the sum
of $665 and interest on that sum from that date at 10
per cent, together with the sum of $24.70, taxes paid by
Waterman, and any taxes that he might pay thereafter.
Whether the option and notes were delivered to plaintiff
by Waterman's attorney is a disputed question, and is
to be determined, but on August 1st the deed was placed
on record by Eddy.   Plaintiff failed to exercise any right
to repurchase under the option, and on May 21, 1906,
Waterman sold and conveyed the premises to Scott Bo-
zorth for the sum of $900 net to him, receiving $300 at
the time, and taking a mortgage for $600.   On Novem-
ber 18, 1906, plaintiff brought this suit to enforce a
redemption of the premises, alleging that he is the
owner thereof, and has at all times been in possession;
that his deed to Waterman was intended as a mortgage
to secure an indebtedness of the plaintiff to the defend-
ant Waterman, in the sum of $665 and interest at 10
per cent per annum from October 1, 1902, together with
any sum which Waterman had paid, or should thereafter
pay, as taxes upon said real property; that this debt was
due and payable October 1, 1903, but that Waterman,
on May 21, 1906, conveyed the land to Scott Bozorth:
that Bozorth bought with notice of plaintiff's alleged
rights.

   The defendants answered separately.   Waterman, by·
general denial, traversed the entire complaint, excepting
that he had conveyed the land to Bozorth, and, as an
affirmative defense, sets forth a detailed history of his

transactions with plaintiff respecting the making of the original loan, the taking of the·mortgage, and in substance that, to avoid the expense and delay of foreclosing the mortgage, plaintiff offered to convey the land to him in settlement and payment of the debt, which he did, and that defendant accepted of the title to the land in payment of the notes which he surrendered and delivered to plaintiff; that plaintiff thereafter never had any possession or right of possession, except as given him by defendant subsequent to the execution of the deed.

Defendant Bozorth denied all the material averments of the complaint, excepting the conveyance to him of the land, and affirmatively alleged that he had no notice, actual or constructive, of plaintiff's alleged equitable rights, and that he was purchaser in good faith and for valuable consideration. The cause being at issue on plaintiff's reply, a trial was had, and findings made in plaintiff's favor, on which a decree was entered, from which both defendants have appealed.      REVERSED.

For appellant there was a brief over the names of *Mr. H. T. Botts, Messrs. Butcher, Clifford & Correll, Messrs. King, Guerin & Kollock,* and *Mr. M. A. Zollinger,* with oral arguments by *Mr. Botts* and *Mr. Kollock.*

For respondent there was a brief over the names of *Messrs. Talmage & Johnson,* and *Mr. Ralph R. Duniway,* with an oral argument by *Mr. Duniway.*

Opinion by MR. COMMISSIONER SLATER.

Two principal questions are presented by the record, which are: (1) Was the deed intended to be only a mortgage; and (2) if so, did Bozorth buy with notice? If the first is determined against plaintiff's contention, the second becomes immaterial.

1. Plaintiff's counsel, however, first argue that an appeal to this court has not been perfected by defendant

Waterman, and that therefore the decree, which established the relationship of mortgagor and mortgagee between them, has become binding as to him, and consequently the only matter left for determination is whether Bozorth is a *bona fide* purchaser for value. But counsel are in error as to their premise. Defendants gave a joint notice of appeal, signed by each of them by their respective attorneys. A joint undertaking on appeal was also filed, wherein the surety undertakes and promises on the part of the appellants "that the said appellants will pay all damages, costs, and disbursements which may be awarded against them on the appeal." It was executed by defendant Bozorth and the surety; but, because it was not executed by Waterman, it is claimed that it is not his bond. It has been held by this court, in *Drouilhat* v. *Rottner,* 13 Or. 493 (11 Pac. 221), that it is not essential that the appellant himself should sign the undertaking on appeal from a justice's judgment, because the appellant is already bound, and no purpose could be served by his joining with the sureties: *Curtis* v. *Richards,* 9 Cal. 38. The language of the Justice's Code there construed is substantially the same as Section 550, B. & C. Comp., under which the present appeal was perfected. That case must be taken as conclusive of the question presented here.

2. It is also claimed that no transcript has been filed on the part of Waterman. There is a sufficient transcript on file, and, the appeal being joint, it is not necessary that each party appealing should file a separate transcript. One is sufficient.

3. We come now to the consideration of whether the deed was in fact a mortgage. It is generally held that a deed, absolute on its face, may be shown by parol to have been intended as a mortgage to secure the payment of money, and such is the settled law of this State: *Stephens* v. *Allen,* 11 Or. 188 (3 Pac. 168) ; *Swegle* v.

*Belle,* 20 Or. 323 (25 Pac. 633) ; *Kramer* v. *Wilson,* 49 Or. 333 (90 Pac. 183).

4. However, the presumption is that the deed is what it purports upon its face to be, and the burden of showing that it was really intended as a mortgage rests upon the one who asserts that to be a fact, which must be shown by clear and satisfactory evidence: *Albany & Santiam W. D. Co.* v. *Crawford,* 11 Or. 243 (4 Pac. 113) ; 27 Cyc. 1017, 1018.

5. It was said by this court in *Stephens* v. *Allen,* 11 Or. 188 (3 Pac. 168), that, when the result of the evidence is to produce doubt, the courts incline to construe the transaction to be a mortgage. Especially would that rule apply where there is an agreement to reconvey, as in this case: Jones, Mortgages (6 ed.) 379. There it is said that courts generally incline against conditional sales, and give the benefit of any doubt arising upon the evidence in favor of the grantor's right to redeem. But the intent of the parties is the governing factor. It is this which must be sought, and where it can be ascertained, it must prevail, and it is essential that the understanding and intention of both parties, grantee and grantor, should concur to convert a deed absolute in its terms into a mortgage: 27 Cyc. 1007.

6. The intent must be sought in the circumstances surrounding the transaction, the pecuniary relations of the parties, their previous negotiations, and their acts and declarations contemporaneous with the making of the deed.

7. Their subsequent acts and admissions respecting the subject-matter of the contract, while material and relevant, are to be considered rather as evidence corroborative of a previously existing intent shown to exist.

8. With this preliminary statement of the law applicable to the case, we approach the facts. Defendant Waterman resides and is engaged in business at Baker

City, in the extreme eastern section of the state, while plaintiff resides in the extreme western section, and in the immediate vicinity of the premises in dispute. At the time of the original transaction, Waterman was in Tillamook City upon a summer's excursion, and was a stranger there. While there he contracted to buy of plaintiff some residence property in that city, and loaned him $475, the amount of the original mortgage debt, to enable plaintiff to liquidate certain record liens incumbering the title to the property, which he had contracted to sell to Waterman. The loan was not made by Waterman to secure the interest, for he was not in the business of loaning money, but it was made to accommodate plaintiff and enable him to invest Waterman with a clear title to the property, which he was buying. At the suggestion of plaintiff, B. L. Eddy, an attorney of that place, was employed by both parties to perform the necessary legal services in consummating the loan and the sale. After this was done Waterman returned to his home at Baker City, and thereafter intrusted his legal business in Tillamook to Mr. Eddy. Plaintiff then resided in Tillamook City, and had agreed with Eddy, as part of the consideration for making the loan, to move on to the mortgaged premises and improve it. The land is 8 or 10 miles west of that place, and forms a part of a peninsula or sand spit, separating the bay from the ocean, and is called the "Sand Spit Place." It is wild land, having some timber and brush upon it, hard to reach, except by rowboat across the bay, and only about five acres thereof were inclosed with a fence, which was then in a dilapidated condition. Within this inclosure was an old house, practically uninhabitable. At the date of the mortgage the place was appraised by Eddy, as Waterman's agent, to be worth about $1,000, but to make the security satisfactory, the former relied upon plaintiff's promise to go upon and improve the place, which he never did, but he did go to a place a

mile or more distant therefrom, where he continued to live, but pastured some stock on this place.

Plaintiff failed to pay the first installment of interest when due, but gave a note for the amount, which was sent to the latter at Baker City. He heard no more from plaintiff until after the maturity of the debt, when, on December 29, 1900, he sent the notes to Eddy for collection, saying to him: "If Elliott will pay all the interest due, I just as soon let the mortgage run as long as said interest is paid annually, but I understand that Elliott is rather slow in paying his obligations. So I wish you to do which you think best according to your own judgment, and if necessary you may have to foreclose the mortgage." Eddy testifies that he told plaintiff that the loan must be paid or it would be foreclosed, and that Elliott said he had no hope of paying unless he could sell the place. Elliott substantially confirms this evidence, and it is quite clear that both parties understood, at the beginning of the negotiation resulting in the making of the deed, that foreclosure must proceed if the debt was not paid. Elliott swears that he made the offer to deed the property if he could not sell. A complication, however, had arisen, which at the time prevented plaintiff from conveying to Waterman or to a purchaser if one were secured. This was occasioned by the death of Elliott, Sr., whose interest in the land had devolved upon plaintiff and plaintiff's brothers and sisters, who were widely scattered, some at that time being in Alaska. So that, to enable plaintiff to deed either to Waterman, or sell and convey to a third party, it was necessary that the title should be centered in plaintiff. This plaintiff thought could be accomplished, because he claimed it had always been understood between his father and himself that plaintiff should have his father's interest in this land for the care and attention he had given his father during the latter's old age. As the expense of foreclosing and se-

curing service of summons upon the heirs by publication would be expensive and consume considerable time, plaintiff was allowed time to procure conveyances to himself of the whole title; but it was in July, 1902, before this was accomplished, and, even then, no release had been obtained from one Ruhl of an inchoate right as tenant by the courtesy as husband of Adelia M. Ruhl, one of the heirs. Waterman paid the necessary legal expenses in procuring these conveyances from the heirs to plaintiff, who in the meantime had made two or three ineffectual attempts to sell. On July 11, 1902, Eddy wrote to Waterman of Elliott's failure to sell, and saying that "In talking with him the other day he indicated that, if he could not do something pretty soon, he would simply give you a full deed to the place, and depend upon you to let him redeem it in the course of a year." Plaintiff himself testifies, in substance, that he said to Eddy that, as Waterman had been so kind to him in giving him an opportunity to seek a purchaser, he did not wish to put him to any further expense to foreclose, and that he would make a deed, but thought Waterman should give him one year in which to redeem. He admits that Eddy told him that Waterman would not likely agree to that. The deed was made on July 21st, and was retained by Eddy, who notified Waterman by letter of its execution, and inclosing a written memorandum of an option to plaintiff to purchase within one year from October 1, 1902, for the price of $665, and 10 per cent interest on that sum from that date, together with $24.70, taxes paid by Waterman, and any that may thereafter be paid by him. This was signed on July 28th at Baker City by Waterman, and returned to Eddy, who, on August 1st, recorded the deed. Now it is admitted by plaintiff that he intended to execute a deed in form, but he contends that he did not intend to convey a legal title. The object of making the deed was confessedly to avoid the neces-

sity of foreclosing, and it is difficult to understand how that was to be accomplished, if the instrument was not in fact to operate as a deed. Upon a careful review of all of the evidence, we have no doubt that Elliott, at the time of making his deed, fully and clearly understood that he was conveying a legal title in satisfaction of the previous debt, and that such will appear from its own evidence. Eddy so testifies, and all the circumstances appear to corroborate his evidence. Plaintiff testifies that the debt was to be continued, and that he was to have two years in which to pay it, and one additional year to redeem, if foreclosed. But he has alleged, in his complaint, that this indebtedness was due and payable within one year from October 1, 1902—that is, on October 1, 1903—which is the exact limit of time fixed in the option for its expiration. He insists that the notes were retained by Waterman and were not canceled, and that the written option was never delivered to him until after the sale to Bozorth. But Eddy had been plaintiff's legal adviser, and was in the habit of keeping his clients' papers in his safe, and he testifies that when this transaction was completed he offered plaintiff the notes and the written option, but that the latter requested that he keep them in his safe for plaintiff, which he did. This must be true, for plaintiff testifies that he was in Eddy's office and inquired if his "bond for redemption," as he terms it, had been returned, and that "when he said they had come, I said, 'I supposed I might still leave them there. I haven't any place to put them.'" There was a bundle of papers marked with plaintiff's name, which contained these notes and the written option, in Eddy's safe. These papers were evidently placed there by plaintiff's direction, and could have been had by him at any time, and were, in fact, delivered to plaintiff at his request, as his property, by Eddy's successor in business, after the sale to Bozorth, and shortly before the commencement

of this suit. We do not think the evidence shows that there was any retention of the notes by Waterman after the making of the deed, and certainly not such a retention as would be evidence of an intention on his part to claim a continued existence of the debt evidenced by them.

9. Great stress is laid by plaintiff's counsel on the fact that their client is unable to write or read anything but print, and that these papers were not read over to him; but we are unable to believe, from the evidence, that he did not understand their true import or was deceived by Eddy in this transaction. The subsequent conduct of the parties confirms our views. While Elliott did exercise some control over the place, by pasturing a span of horses in the 5-acre inclosure, and by warning hunters off, yet all this was evidently done in pursuance of an undertaking had with Waterman, about one month after the making of the deed, that he should keep the fences up and look after the place for that privilege. It is a significant fact, also, that some time after that Waterman granted to one Higgins a license to hunt on the place, and the use of it, in consideration that the latter would pay the taxes. Higgins notified Elliott of his license, and asked for the key to the old house on the premises, and asked plaintiff to take his horses out of the inclosure. Elliott surrendered the key to Higgins, but did not take his horses away, and the latter turned them out. This angered Elliott, who declared he would overcome Higgins' right. To accomplish his purpose he applied to Peter McIntosh, a friend living at Tillamook, and asked him to purchase from Waterman the latter's interest in the place. Now McIntosh had previously been an agent for Waterman in looking after his property in that city and collecting rent, and had some knowledge of the business relations that had previously existed between Waterman and Elliott. In February, 1901, he had written Waterman

that he might as well foreclose on Elliott, as he would never pay the mortgage. He also knew that Elliott had given Waterman a deed, and at one time wrote him that when Elliott's option runs out he could sell the place to some other parties. On September 25, 1903, he wrote him, at Elliott's request, saying, "I have been talking with Geo. Elliott, and he wants me to arrange with you for an extension of time on his Sand Spit Place." Now it is important to note that his letter is dated five days before the expiration of the one year given in the option to repurchase, and the request for an extension of time must have reference to that instrument. This shows that Elliott knew that by the terms of the contract between him and Waterman he had but one year after October 1, 1902, to exercise whatever rights he had, and not three years, as he now contends, in which to "redeem," as he terms it, and he also must have understood that his rights would terminate unless he got an extension. Moreover, on November 1, 1904, McIntosh again writes Waterman at Elliott's request, asking if he will make a bond for a deed to a young man by the name of Currell, covering 60 acres of the land. Nothing came of this, and on the 16th he again wrote him, asking "what kind of a deal or bond would you fix out for me," saying, in addition, that he would like to help Elliott out. On December 8th, he writes, referring to the Higgins matter, "Elliott does not wish to do anything contrary to your wishes, but does not wish to give possession of the place unless notified by you to do so. I will probably arrange a little later to take the place off your hands," etc., and on December 13, 1904, he makes Waterman a definite offer of $800 for the place, payable in four equal annual installments, the first falling due in September, 1905. This appears to have been satisfactory to Waterman, who, in exchange for McIntosh's notes, gave the latter a bond for a deed in

double the amount of the purchase price in the usual form.

This transaction was understood by all of the parties. if finally carried out, to have the effect of vesting in McIntosh the legal title, and that the latter was acting for the benefit of Elliott. It was entered into with his knowledge and at his request, and he now claims an equitable interest in the contract by reason thereof. While the bond is not in evidence, it is agreed that it was in the usual form, and must have bound Waterman on receiving payment of the consideration to convey by deed the legal title to McIntosh. Therefore it must be an admission by Elliott that Waterman had the legal title to convey. It could rest on no other assumption. McIntosh, not being able to make his first payment in the summer or fall of 1905, offered to surrender his bond in consideration of the return of his notes, and he sent Waterman the bond with a request to return the notes. The latter was at first disinclined to accede to the request, and for some time retained the notes; but, having met with an opportunity to sell to Bozorth, he finally, either just before or just after consummating the sale, surrendered to McIntosh the latter's notes, which, together with the bond, were destroyed by him. This was done, it is now claimed by plaintiff, without his knowledge or consent, and therefore is not binding on him, and that in equity it still exists, and must be foreclosed by Waterman or his successor in interest. But a contract in writing to convey land can be abandoned by parol: *Guthrie* v. *Thompson.* 1 Or. 353; 29 Am. & Eng. Enc. Law (2 ed.), 645. And we are unable to understand how any equitable interest in the contract became vested in Elliott, or how Waterman was under any equitable duty to Elliott simply because the contract was made by McIntosh at Elliott's request. The latter assumed no obligation to pay the consideration or any part of it.

10. If the contract between Waterman and McIntosh had been carried out, and the latter, paying the consideration, had become invested with the legal title, we do not understand that Elliott was possessed of such equities as would entitle him to a conveyance from McIntosh: *De Roboam* v. *Schmidtlin*, 50 Or. 388 (92 Pac. 1082). Neither is there such a disparity between the amount due Waterman and the value of the land at the time of his taking the deed as would be indicative of an intent to mortgage. The land had been estimated, four years before, to be worth about $1,000, but there is no evidence that it would have sold for that. It appears clear that Waterman, after he got the title and the option had expired, was quite anxious to sell for enough to reimburse him for his outlay and expense, but was unable to do so, and when he did sell, the consideration received by him did not make him whole. He always paid the taxes, excepting one year paid by McIntosh, and by the sale to Bozorth made no profit to himself out of the transaction. Because land may have raised in value and attained some importance in that neighborhood since Bozorth bought, by reason of an anticipated construction of a railroad into that vicinity, can furnish no sound basis for adjudging the deed in question to be a mortgage.

From these considerations the decree should be reversed, and one entered here dismissing the complaint.

REVERSED.