Argued December 6, 1978, affirmed February 7, 1979

# DAN BUNN, INC., et al,
*Appellant/Cross-respondents,*
*v.*
# BROWN et al, *Respondents/Cross-appellants,*
# RATZLAFF et ux, *Respondents.*
## (TC 23149, SC 25446)

590 P2d 209

Robert Mix, Corvallis, argued the cause and filed the brief for appellants/cross-respondents.

Gary Rueter, of Marsh, Marsh, Haugeberg, Rueter & Phillips, P.C., McMinnville, argued the cause and filed the brief for respondents/cross-appellants Milton O. Brown and Donald E. Kettleberg.

John Bryan, of DeArmond, Sherman & Bryan, Salem, argued the cause and filed a brief for respondents Mary Jean Ratzlaff and Lavern Ratzlaff.

Before Denecke, Chief Justice, and Tongue, Bryson and Linde, Justices.

TONGUE, J.

Linde, J., concurring.

**TONGUE, J.**

This is a suit by a real estate developer against two Portland attorneys for specific performance of an earnest money agreement for the sale of approximately one thousand acres of undeveloped land in Polk County.[1] Defendants alleged as defenses that plaintiff failed and neglected to perform all of the conditions of the sale within 30 days, as provided by the agreement, and that after a request by plaintiff for an extension of time for performance the parties agreed to rescind the earnest money agreement and pay to plaintiff a sum equivalent to 10 percent of the sales price of the property if sold to a subsequent purchaser.

The trial court denied specific performance of the earnest money agreement, based upon findings that neither party "fully or substantially performed their respective obligations under the terms of the earnest money agreement" and that there was a "failure of proof on both sides regarding performance of said agreement." The trial court, however, entered judgment in favor of plaintiff for the sum of $50,000, based upon findings that the parties had "effected a binding oral rescission of said earnest money agreement" and created "a new or substitute contract" under which defendants were obligated to pay $50,000 to plaintiff.

In appealing from that decree plaintiff's principal contentions are: (1) that the trial court erred in denying specific performance of the earnest money agreement and (2) that there was no "clear and convincing" evidence of a rescission or of a "new

---

[1] Strictly speaking, there were two plaintiffs, Dan Bunn, Inc., and Dan Bunn, individually. For the purposes of this opinion, however, these two plaintiffs will be referred to as "Dan Bunn" or as "plaintiff."

The complaint also named the subsequent purchasers of the property, Mr. and Mrs. Ratzlaff, as defendants and asked that the sale to them be cancelled upon the ground that they were not bona fide purchasers. Because of the basis on which we decide this case it is not necessary to decide that question. For the same reason, only defendants Brown and Kettleberg will be referred to as "defendants."

agreement" and that any such oral agreement was void under the Statute of Frauds.[2]

*The facts.*

Defendants Brown and Kettleberg are Portland attorneys. In 1968 they purchased a tract of approximately one thousand acres of undeveloped land in Polk County. In January 1976 Mr. Kettleberg called Mr. Bunn to inquire whether he might be interested in defendants' land. Defendants testified that they were interested in selling it at that time because of their concern over the possible imposition of increasingly restrictive land use regulations and the adverse effect that such regulations would have on the value of the property. Mr. Bunn had been in the real estate and "subdivision business" since 1964.

1. *The meeting on February 6, 1976—preparation of earnest money agreement.*

Mr. Bunn, after being contacted by Mr. Kettleberg, made an investigation of the property and met with defendants in their office on February 6, 1976. At that meeting Mr. Bunn explained to defendants his plan for subdividing a part of the property as an "initial phase." The parties then proceeded with negotiations, during which Mr. Bunn offered to pay $350,000 for the property, but with no down payment. According to defendants, Mr. Bunn told them that the contract payments were to be made from funds which he hoped to receive from sales made after obtaining subdivision approval, but that he would provide security for such payments, to be put in escrow. At that meeting Mr. Bunn also provided defendants with a financial statement showing a net worth of over $1,000,000.

After discussing this and other matters an earnest money agreement was prepared and signed. It provided for sale of the property by defendants to plaintiff

---

[2] Plaintiff also made several other contentions, as subsequently discussed.

at a purchase price of $350,000, with no down payment, and with payments of $11,658 every three months. The agreement included a provision for deed releases, so as to permit plaintiff to proceed with the subdivision of the tract. It also acknowledged the receipt of plaintiff's promissory note for $30,000 as earnest money, to be returned "upon closing."

The earnest money agreement also provided, among other things, that time was of the essence and that "closing of this transaction shall be within 30 days." In addition, it was provided that as security for the quarterly contract payments, "Buyer shall deposit in an agreed escrow account at his expense assignments of real property contracts to seller with an approximate $30,000 balance and a bill of sale with endorsed stock certificates * * * conveying all title to Seller of 100% of stock" in a corporation with assets consisting of a tavern in Washington, with an agreed value of $50,000.

Finally, the agreement provided that:
> "This agreement is subject to * * * obtaining a satisfactory report for subdivision purposes. * * *."

With reference to that provision, plaintiff testified that he wanted to know what the attitude of Polk County would be toward approving the subdivision before purchasing the property and that he "wanted an escape clause if I went over there and they told me the comprehensive plan or something was wrong for the area." Plaintiff also testified that a "satisfactory report for subdivision purposes" did not mean formal approval, which would take six to eight months, but meant an oral indication that the Planning Commission would look favorably on the proposed subdivision.

Defendants conceded that plaintiff suggested that provision. They testified, however, that the provision was not included "only at Mr. Bunn's request." They also testified that even though, in the event of a default, they could have sued plaintiff for breach of contract, that provision was of importance to them

[135]

because plaintiff had told them that "each deal has to stand on its own feet and support itself" and that he intended to make the contract payments after getting subdivision approval and out of the sale of the subdivided parcels.

According to plaintiff, at the conclusion of that meeting it was agreed that the final contract would be prepared by defendant Brown. This was denied by defendants.

2. *Intervening events—failure to get "satisfactory report for subdivision purposes."*

Plaintiff then ordered a title report and hired a sanitary engineer to make septic tank soil tests. He also made an application to Polk County for subdivision approval. That application was put on the agenda of the Planning Commission for March 2, 1976. On February 24, 1976, plaintiff also filed an application for septic tank evaluation, which required a minimum of three weeks for a report by the county sanitarian. For some reason, the hearing on the application for subdivision was not heard on March 2d, and was not heard until March 16th when it was denied.

At some time prior to Friday, March 5, 1976 (three days before the expiration of the 30-day period for closing the transaction), plaintiff called defendants and arranged for a meeting on that date to discuss an extension of time because of the postponement in the meeting of the Planning Commission. Plaintiff claims to have established an escrow with Key Escrow as of that date and to have delivered to it a copy of the earnest money agreement, a copy of the title report, and some ledger sheets representing payment records relating to several contracts being collected. He had not, however, placed in escrow any original land sale contracts or assignments of such contracts, claiming that defendants were to pick out from that group of contracts the ones they desired to have held as security. Neither had plaintiff placed in escrow the bill of

sale or stock certificates for the Washington corporation, endorsed for transfer by himself, his wife and his brother. At first plaintiff testified that they had been endorsed and ready for deposit in escrow. He later admitted that they were not endorsed by his wife and brother until March 10th or 15th, but said that he "could have got them in a minute's notice."

The escrow file of Key Escrow, as offered in evidence by plaintiff, included a copy of a letter dated October 15, 1976 from it to plaintiff indicating that the escrow had been opened in its Salem office on March 5th. From a "log book" of the serial numbers of escrow accounts, however, it appears that if those serial numbers were correct this escrow account could not have been opened prior to Monday, March 8th. It also appeared that plaintiff was one of the largest customers of Key Escrow and met with one of its owners the day after his March 5th meeting with defendants in an unsuccessful attempt to secure an extension of the 30-day period for the closing of the transaction, which was to expire on Monday, March 8th.

In addition, it appeared that between the meetings of February 6th and March 5th Mr. Ratzlaff, the tenant on the property, expressed to defendants an interest in purchasing the property and that there had been some negotiating by defendants with him for a possible sale of the property to him at a price of $500,000.

3. *The meeting on March 5, 1976—refusal of extension—agreement to rescind earnest money agreement.*

On Friday, March 5, 1976, plaintiff met with defendants at their office in Portland and offered them $2,000 for an extension of the time for closing the transaction, apparently because of the postponement of the hearing before the Planning Commission. Defendants refused that offer, saying that they had another deal pending with Mr. Ratzlaff for $500,000. Plaintiff testified that there was discussion of the

conditions of the earnest money agreement relating to subdivision approval and that he then told defendants that he wanted to "go ahead and take the property anyway" and that he was "removing the contingencies."

In the course of the ensuing heated discussion (which included suggestions, if not threats, of litigation), plaintiff wrote on a piece of paper: "I am satisfied with planning on the 996 acre," with his signature.

Defendants then left the room for a few minutes. According to plaintiff, when they returned they asked him whether he would "accept $50,000 to get out of this earnest money," and he said that he would accept the proposal if they would put it in writing. Also, according to plaintiff, when defendants did not "write it up" as requested by plaintiff, he said that he would "show you how."

Defendants denied that plaintiff asked that the proposal be put in writing and testified that the proposal was not to pay $50,000 in cash, but to pay an amount of money equivalent to 10 percent of the sales price to Mr. Ratzlaff, which the parties assumed would be $500,000, in return for plaintiff's agreement to rescind the earnest money agreement and refrain from filing a lawsuit on it. Defendant Kettleberg also testified that plaintiff was to be paid 10 percent of the down payment and of all payments received, but that if Ratzlaff was unable to pay for the property "that would be the end of what you would get."

In any event, Mr. Kettleberg then left the meeting and went to Sun Valley for a skiing vacation. Plaintiff testified that he objected to Mr. Kettleberg leaving, saying that the agreement couldn't be "written up" if Kettleberg was going skiing, and that Kettleberg said that he would leave a power of attorney with Brown, but did not do so. Kettleberg denied that plaintiff had then demanded that the "rescission" agreement be put in writing, but testified that he had given defendant

[138]

Brown authority to sign documents on his behalf and could have returned from Idaho in three hours if necessary. In any event, the meeting then broke up and plaintiff left defendants' office.

*4. Subsequent events—plaintiff's attempt to close transaction.*

On the next day, Saturday, March 6, 1976, plaintiff went to see Ruth Butell, one of the owners of Key Escrow, who prepared for him a letter addressed to defendants, sent by certified mail and predated March 5, 1976, as "notice" that plaintiff removed from the earnest money agreement "any and all contingencies relative to a satisfactory report for subdivision purposes."

Late in the afternoon of that same day plaintiff called defendant Brown by telephone. The testimony is conflicting as to what was then said. According to plaintiff, he said to Brown "Are we going to do this $50,000 deal"; that Brown said "Yeah" and also said that "that was an easy $50,000 * * *"; that plaintiff then said "that was an easy $100,000 you made" and asked "Are we going to write it * * *," and that Brown was "just real vague about it."

According to Brown, however, plaintiff called to ask if he had "gotten ahold of Ratzlaff"; that plaintiff then said "let me go over that deal one more time," after which he started "going through the same thing, if we sold it to him [Ratzlaff] for $500,000 and ten percent of what he [Bunn] would get"; that *plaintiff* then said "this is the easiest $50,000 I've made," and that Brown then said "Yeah, it's a good deal for all of us." Brown also testified that plaintiff never asked him to "write it up," but that he would have done so if requested by plaintiff, if only to protect himself in the event that plaintiff filed a lawsuit.

The next day, Sunday, March 7, 1976, plaintiff went to see his attorney. He said that he then tried unsuccessfully to call defendant Brown and left a

[139]

message with Brown's secretary that "I want the property. I want Mr. Brown to draw the contract and I want to get it done." A letter was then prepared, addressed jointly to defendants and to Mr. Ratzlaff, demanding that the sale be completed to plaintiff "in accordance with the earnest money receipt." The letter also stated that "in accordance with our agreement you are to prepare the contract"; that the "stock will be delivered to escrow not later than closing"; that "the property is accepted for subdivision purposes," and that plaintiff was "ready and able to perform on our obligation under the contract."

At about 8 a.m. on the morning of Monday, March 8, 1976, (the last day for closing) plaintiff took a copy of that letter to defendants' office. Defendant Brown had not arrived. Plaintiff did not wait for Brown, but delivered the letter to Brown's secretary and then left. Plaintiff said that later that day he tried unsuccessfully to return a telephone call from Brown. He did not, however, deliver into escrow any land sale contracts, with assignments, or the bill of sale and stock in the Washington corporation, as provided by the earnest money agreement, but testified that he could have done so had defendants cooperated by going to Salem to "pick out" the contracts they wanted as security and that the assignments would then have been prepared at the escrow office on closing.

Defendant Brown testified that upon receiving plaintiff's letter on March 7th he "couldn't understand what had happened" and immediately tried to call plaintiff and "left a message," but "never got a return call." Defendant Kettleberg was still in Sun Valley on that day.

On the next day (March 9th) defendant Brown mailed the following letter to plaintiff:

"As you are well aware, on Friday, March 5, 1976, we refused to grant an extension of time under the earnest money and it was impossible to resolve the contingencies within the time allowed for closing and the transaction was called off.

[140]

"You have done nothing to attempt to close this transaction within the agreed time nor have any of the contingencies been resolved.

"We are therefore returning your note."

Meanwhile, at nearly midnight on March 8th defendants entered into another earnest money agreement to sell the property to Mr. Ratzlaff for $500,000, with $40,000 down, but did not pay to plaintiff any part of the money received from Ratzlaff.

On March 11th, 1976, plaintiff filed this lawsuit.

*The earnest money agreement was not enforceable due to failure to satisfy a condition precedent.*

In support of his contention that the trial court erred in denying specific performance of the earnest money agreement, plaintiff says that it was an enforceable agreement and that "defendants, having in the meantime received an offer of an additional $150,000 for the property from the Ratzlaffs, refused to cooperate with plaintiff in closing the sale by usual means, generally acted in bad faith and then sold the property to the Ratzlaffs in violation of the purchase rights of the plaintiff." Plaintiff also says, among other things, that he made a tender of performance, which was "the equivalent of performance" under ORS 81.010 and 81.020; that the law implies in all contracts a duty of good faith and cooperation, and that if defendants had acted in good faith and had agreed to meet plaintiff at the escrow office the contracts and stock would have been delivered into escrow as security and the transaction would have been closed. Plaintiff says that instead, as a result of defendants' "evasive tactics" and by the absence of defendant Kettleberg, defendants violated their duty of good faith and made it impossible to close the transaction.

Plaintiff also contends that the fact that the earnest money agreement was "subject to * * * obtaining a satisfactory report for subdivision purposes" was no

[141]

obstacle to the granting of specific performance because that condition was not a condition precedent for protection of the defendants, who had ample protection under the security and deed release provisions of the agreement, but was inserted for plaintiff's sole benefit, with the result that he was entitled to waive that condition. Finally, plaintiff says that there is a "strong implication" that defendants "connived with Ratzlaff to prevent plaintiff from getting subdivision approval * * *", and that "[s]uch connivance cannot serve as a basis for denying specific performance in a court of equity" even if "subdivision approval" was a condition for defendants' protection.

Defendants, in response, contend that the trial court properly denied specific performance of the earnest money agreement because: (1) "the evidence unequivocally demonstrates that plaintiff failed to sustain his burden of proof by a preponderance of believable evidence that he was, in good faith, ready, willing and able to perform as he alleged"; (2) "the earnest money agreement was made 'subject to' obtaining a favorable subdivision report," which was included as a condition precedent for the benefit of both parties and was not satisfied by plaintiff, and (3) plaintiff and defendants mutually rescinded the earnest money agreement.

In *Ross v. Harding,* 64 Wash 2d 231, 391 P2d 526 (1964), as in this case, plaintiff sought specific performance of an earnest money agreement for the sale of real property which provided that it was "subject to the written consent of the lessor." We agree with the analysis of the problem by the Washington court in holding that because that condition had not been satisfied plaintiff was not entitled to specific performance of the agreement. Thus, the court stated (at 530-31) that:

" 'Conditions precedent' are those facts and events, occurring subsequently to the making of a valid contract, that must exist or occur before there is

[142]

a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available. 3A Corbin, Contracts § 628, p. 16; * * *."

and that:

"Whether a provision in a contract is a condition, the nonfulfillment of which excuses performance, depends upon the intent of the parties, to be ascertained from a fair and reasonable construction of the language used in the light of all the surrounding circumstances. 5 Williston, Contracts (3d ed.) § 663, p.127."

In that case the court held that the words "subject to" clearly indicated an intent to impose a condition precedent which, unless satisfied, would prevent specific performance of the contract. Similarly, we hold that the provision that "[t]his agreement is subject to * * * obtaining a satisfactory report for subdivision purposes" clearly indicated an intent to impose a condition precedent which, not having been satisfied, prevented specific performance of this contract.

Decisions by this court, although not involving similar facts, are to the same effect. *See, e.g., The Simms Co. v. Wolverton et al,* 232 Or 291, 297, 375 P2d 87 (1962), and *Deitz v. Stephenson,* 51 Or 596, 605, 95 P 803 (1908).

It may be that if this condition had been for the sole benefit of the plaintiff, it could have been waived by him. Under the facts of this case, however, and despite some conflict in the testimony, we believe that this condition was included for the benefit of both parties and that it was for the benefit of the defendants, as sellers, as well as the plaintiff, as the buyer, that "a satisfactory report for subdivision purposes" be obtained.[3]

---

[3] In view of the concurring opinion by Linde, J., it should be emphasized that the test to be applied in such a case is whether it was intended by both parties that such a contention be included in the contract for the benefit of both of them, not whether the condition was in fact of benefit to both parties.

It is true, as contended by plaintiff, that defendants, as the sellers, also had the benefit of contract provisions for security and for various remedies in the event of default. Nevertheless, the seller of unimproved real property to a "subdivider" who intends to subdivide it and to obtain funds with which to make payments to the seller from the proceeds of the sale of subdivided lots has a clear interest in receiving assurance that the subdivision of the property will be approved regardless of other provisions relating to security and remedies in the event of default.

■ In our judgment, it follows that plaintiff, having failed to secure such "subdivision approval," even of the informal nature which may have been within the contemplation of the parties, was not entitled to specific performance of this earnest money agreement despite his alleged "tender of performance" by letter dated May 7, 1976. This is true regardless of whether defendants acted in "bad faith" in refusing to extend the time for closing the agreement, in selling the property to Mr. Ratzlaff, and in refusing to cooperate with plaintiff in making escrow arrangements for the closing of the agreement. It may be that this result would not follow if plaintiff had proved that defendants "connived" with Mr. Ratzlaff to prevent approval of the subdivision. In our judgment, however, plaintiff did not prove that contention by a preponderance of evidence.[4]

*The earnest money agreement was also rescinded and superseded by oral agreement.*

On the question whether the trial court erred in finding that the earnest money agreement had been rescinded and superseded by an oral agreement that defendants pay $50,000 to plaintiff, both parties now find themselves in somewhat incongruous positions.

---

[4] Because of the basis on which we decide this case we need not consider defendants' further contention that plaintiff also failed in other respects to satisfy the requirements of the earnest money agreement and that plaintiff's performance and defendants' performance of the duties imposed by that agreement were concurrent conditions.

If plaintiff, being unsuccessful in his attempt to obtain a decree of specific performance, is successful in his contention that the trial court erred in finding that the earnest money agreement was rescinded and superseded by an oral agreement under which plaintiff is entitled to be paid $50,000, it would follow that the judgment for $50,000 in favor of plaintiff must be reversed. Conversely, if defendants, although successful in defending against plaintiff's suit for specific performance, are also successful in their contention that the trial court did not err in finding that the earnest money agreement was rescinded and was superseded by an oral agreement, it would follow that defendants are obligated to make at least some payment to plaintiff, although defendants deny that they are obligated to pay $50,000 to plaintiff, as held by the trial court.

Our duty, however, in trying this case de novo, is to determine from the record whether the parties made an oral agreement to rescind or supersede the earnest money agreement and, if so, the terms of that agreement, as well as its legal validity, in view of the question whether such an oral agreement is invalid as in violation of the Statute of Frauds.

■ In reviewing the record for this purpose, we find the testimony to be both conflicting and confusing, and that the credibility of some of the testimony offered by both parties was substantially impeached. In such a case, although tried de novo by this court on appeal, we must necessarily accord considerable weight to findings of fact by the trial judge, in view of his opportunity to observe the demeanor of the witnesses as they testify. *See Wilkinson v. Carpenter,* 276 Or 311, 314, 554 P2d 512 (1976).

Viewing the record in this light, we agree with the finding by the trial court that there was an oral agreement between the parties to rescind and supersede the written earnest money agreement and that the terms of that agreement were to the effect that

defendants pay a lump sum of $50,000 to plaintiff in consideration for his agreeing that the earnest money agreement be terminated.

It follows that we agree with the finding by the trial court that it was not a part of the agreement that payment of the $50,000 was conditional upon the receipt of $500,000 from Mr. Ratzlaff or was to be payable solely from such money as defendants received from Mr. Ratzlaff, as contended by defendants. We also agree with what must have been the finding by the trial court that it was not a condition of that agreement that it first be put in writing, as contended by plaintiff.

The question remains whether that oral agreement is valid in view of plaintiff's contention that an earnest money agreement for the sale of land, being an agreement which must be in writing (as required by the Statute of Frauds), may not be rescinded or superseded by such an oral agreement.

As stated by plaintiff, there is some conflict of authorities on this question, citing Annot., 42 ALR3d 242 (1972). In Oregon, however, this court has held, as early as in the leading case of *Guthrie v. Thompson,* 1 Or 353 (1861), that a contract in writing to convey land can be abandoned by parol. As held in that case (at 356), although under different facts, "the question of abandonment is really one of fact, as to the intent and understanding of the parties."

This court in *Elliott v. Bozorth,* 52 Or 391, 403, 97 P 632 (1908), and in *Hughes v. Helzer,* 182 Or 205, 226, 185 P2d 537 (1947), although again under different facts, reaffirmed the rule that such a contract may be abandoned by parol.

■ Applying the rule of *Guthrie* to the facts of this case, we find, as apparently did the trial court, that when these parties entered into the oral agreement that defendants pay $50,000 to plaintiff they intended to abandon the previous earnest money agreement for

[146]

a sale of the property by defendants to plaintiff. It follows that such an oral agreement was not required by the Statute of Frauds to be in writing.

■ In any event, there is good authority, with which we agree, that when, as in this case, the written agreement to sell land is still executory and possession has not been taken by the purchaser a rescission of such an agreement need not be in writing and is not under the Statute of Frauds. *See* Calamari and Perillo, The Law of Contracts 726, § 19-37 (2d ed 1977), and 4 Williston on Contracts 207-10, § 592 (3d ed 1961). *See also* 2 Corbin on Contracts 91-94, § 301 (1950), and Annot., 42 ALR3d 242, at 247, 253 (1972). This is particularly true when, as in this case, the written contract to sell land is not enforceable. *See* Restatement on Contracts § 222 (1932).

■ Plaintiff also contends that this oral agreement between the parties was invalid because it was required by the Statute of Frauds to be in writing as an agreement which could not be performed within one year. We need not decide whether performance within one year would have been possible under defendants' version of the agreement, under which payments were to be made to plaintiff only from payment received by defendants under their contract to sell the property to the Ratzlaffs. Under the terms of the agreement as found by the trial court and by this court, the sum of $50,000 was not to be paid in such a manner, but was payable as a lump sum, and (presumably) within a reasonable time from the date of that agreement.

For these reasons, we hold that the trial court did not err in its holding that the parties had rescinded and superseded the earnest money agreement by a new or substitute contract under which the sum of $50,000 was payable by defendants to plaintiff.

*Other assignments of error—cross-appeal.*

In view of our decisions upon these issues it becomes unnecessary to decide whether the trial court

erred in holding that plaintiff was estopped to assert the Statute of Frauds, or whether the Ratzlaffs were bona fide purchasers, as also assigned as error by plaintiff, and also to address separately the question whether the court erred in awarding judgment of $50,000 to plaintiff, as assigned as error on cross-appeal by defendants.

We also hold that under the facts and circumstances of this case the trial court did not abuse its discretion in denying plaintiff's motion, made at the commencement of the trial, that defendants be required to elect between their first and second affirmative defenses. *Cook v. Kinzua Pine Mills Co. et al,* 207 Or 34, 46, 293 P2d 717 (1956).

■ In addition, we hold that the trial court did not err in not awarding plaintiff interest at the rate of nine percent per annum from March 15, 1976, as demanded by plaintiff, based upon what plaintiff contends that the trial court "presumably intended." There is nothing in the record, in our opinion, to demonstrate an intent by the trial court to award back-dated interest, and at such a rate.

■ Finally, we hold that the trial court did not err in not allowing attorney fees to plaintiff under the provision of the earnest money agreement that "[i]n any suit or action brought on this contract, the losing party agrees to pay the prevailing party's reasonable attorney's fee * * *." The "suit or action brought on this contract" was plaintiff's suit for specific performance of that contract. Defendants, rather than plaintiff, were the prevailing parties in that suit, insofar as the decree of the court denied plaintiff's demand for specific performance. In addition, that contract was found by the trial court, over plaintiff's objection, to have been rescinded by a subsequent oral agreement, with the result that defendants, rather than plaintiff, were also the prevailing parties on that issue. Under these facts and circumstances, we hold that although the trial court entered a decree which included a

judgment in favor of plaintiff in the sum of $50,000, from which plaintiff has appealed, he was not entitled to demand an award of attorney fees by the trial court as the "prevailing party" under that contract provision of the earnest money agreement.

For similar reasons, and in view of the $50,000 judgment awarded against them, we hold that the trial court did not err in denying attorney fees to defendants, as also contended by them in their cross-appeal. As we view it, and as a practical matter, there was no "prevailing party" in the trial court under the facts of this case for the purposes of that provision of the earnest money agreement.

Finding no error, the decree of the trial court is affirmed, with no costs to any party.

**LINDE, J.,** concurring.

I agree that the parties rescinded the original contract in return for a nonconditional promise by defendants to pay plaintiff $50,000. I am not persuaded that defendants could rely on the lack of a favorable report on tentative subdivision approval as a condition relieving them of the obligation to go through with the sale to plaintiff, but in view of the rescission, I need not pursue that disagreement with the majority opinion.