Argued and submitted December 12, 1995, affirmed April 30, 1997

Ronald R. ROSELIUS,
individually and as managing general partner of
Port Orford Properties Partnership II (POPP-II);
and Donna Roselius,
*Appellants,*

*v.*

Dale J. HOEHNE
and LaRona Hoehne,
*Respondents.*

(92 CV 255; CA A83279)

938 P2d 229

Clayton C. Patrick argued the cause for appellants. With him on the briefs was Patrick & Meadowbrook.

Roger Gould argued the cause and filed the brief for respondents.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

ARMSTRONG, J.

**ARMSTRONG, J.**

Plaintiffs appeal from a judgment for defendants declaring defendants' interest in one partnership and winding up the affairs of two other partnerships. We review the court's findings *de novo*, ORS 19.125(3), and affirm.

The disputes between the parties arose from a series of transactions involving the acquisition of two motels and a restaurant in Port Orford, Oregon. Defendants met plaintiffs in December 1985 when defendants were the managers of the Neptune Motel in Port Orford. Plaintiffs were members of the Port Orford Properties Limited Partnership - II (POPP-II) that was then considering whether to purchase the motel. The partnership ultimately did so, and defendants invested $15,000 to purchase 15 units in POPP-II. After the acquisition, defendants continued to work as the managers of the motel, for which they were paid a salary.

In the summer of 1986, POPP-II considered whether to purchase and operate the Battle Rock Motel and the Rainbow Restaurant in Port Orford. It ultimately decided not to do that. Instead, differing combinations of POPP-II partners decided to purchase the two properties. Plaintiffs and defendants formed a joint venture to acquire the Rainbow Restaurant and two adjoining lots. They also joined other POPP-II partners in a plan to purchase the Battle Rock Motel.

Plaintiffs and defendants signed a joint-venture agreement for the restaurant in November 1986. The agreement established a mechanism by which defendants would acquire a 50 percent interest in the restaurant and the adjacent lots as compensation for their work to renovate and operate the restaurant. The parties eventually had a falling out over management of the restaurant, with plaintiffs contending that the restaurant was losing money because of defendants' failure to hire a full-time manager for it. In April 1988, plaintiffs hired a manager, and defendants thereafter had nothing further to do with the restaurant. Both parties agree that the restaurant joint venture was effectively dissolved on April 18, 1988.

After the dissolution, plaintiffs claim to have lost track of defendants. In 1991, defendants demanded compensation from plaintiffs for the value of defendants' interest in the restaurant on dissolution of the joint venture. Disputes also arose between the parties over defendants' interest in POPP-II and in the Battle Rock Motel.

Plaintiffs ultimately filed this action to resolve the various disputes. The action was tried to the court, which found in favor of defendants on all issues. It found (1) that defendants own 21 units in POPP-II, (2) that they owned a 20 percent interest in the Battle Rock Motel in partnership with plaintiffs and are entitled to receive 20 percent of the net income and equity of that partnership through its dissolution on December 31, 1993, and (3) that they are entitled to receive $12,808 for their interest in the restaurant joint venture. Plaintiffs generally contest those conclusions on appeal.

We turn first to the dispute over whether defendants had a 20 percent interest in a partnership with plaintiffs that owned and operated the Battle Rock Motel. Plaintiffs claim that they are the sole owners of the motel because they paid back all of the POPP-II partners who had advanced money to purchase it. They contend that, although defendants were originally interested in forming a partnership to acquire the motel, they later changed their minds and asked that the $5,000 that they had advanced toward the purchase be converted into five POPP-II units. Defendants contend that they formed a partnership with plaintiffs to purchase the motel and that they did not convert their investment in that partnership into additional POPP-II units.

■ We conclude that plaintiffs and defendants formed a partnership to acquire the Battle Rock Motel. In a July 9, 1986, memorandum to the POPP-II partners, plaintiff Ronald Roselius explained the status of the Battle Rock purchase as follows:

> "This project was put together, against the initial wishes of [two POPP-II general partners,] solely by myself and [defendants] with $20,000 of our money, $15,000 of *loaned* money from Brice, McMaster, and Meskauskas, and [a] $10,000 *temporary loan* from Neptune operating funds seasonal surplus."

(Emphasis in original.) That discussion identifies plaintiffs and defendants as principals in the project and the other POPP-II partners as people who had simply loaned money to purchase the motel.

A July 26, 1986, memorandum from Roselius to the POPP-II partners, prepared after the partnership had voted not to acquire the Rainbow Restaurant and the Battle Rock Motel, made the same point:

"Regarding the Battle Rock Motel property—

*"The two [p]artners, [defendants] and myself,* who provided the only initial invested capital and essentially all of the work in acquisition and establishment of operations, will be the initial principal owners and managers. Frank Cummings has also asked to be a [general partner] and has invested capital, and Bill Brice has expressed interest in being a [general partner]. The group will function under the abn of POPP-III and probably as a General Partnership, at least for some time."

(Emphasis supplied.) Thereafter, Roselius sent a letter to the Chetco Federal Credit Union requesting that a loan to purchase the motel be rewritten to include only plaintiffs and defendants:

*"The capital provided by [defendants] and myself was committed as a permanent investment.* It is our intent to repay the 'loan' monies to the first three named parties on or about November 30 at the same time as we complete the final payment to the sellers. After that the only invested capital will be from [defendants] and myself and from operating funds."

(Emphasis supplied.) Based on that and the other evidence in the record, we conclude that plaintiffs and defendants intended to form a partnership to acquire and operate the Battle Rock Motel.

Plaintiffs contend, however, that defendants abandoned that intention and asked that their investment in the motel be converted into additional POPP-II units. Plaintiffs principally rely on two documents to support that contention. One is an August 1986 letter to the POPP-II partners. It states:

"[Defendants] have asked that their $5000 be converted to units in POPP-II—this will be done effective Jan. 1, 1987 (for tax reporting simplification purposes)[.]

"If upon receipt of this letter any of you wish to purchase more units in POPP-II, sufficient to keep the [Battle Rock Motel] property in the POPP-II partnership, let me know by September 8th. Otherwise I will proceed with the action noted in the above paragraph."

The other is a January 1987 letter from Roselius to defendants in which Roselius wrote:

"As you requested (last Aug./Sept.) I've transferred, to the POPP-II share accounts ('units') the $5000 you put into [the] POPP-II capital account last [s]ummer for the purchase of [the Battle Rock Motel] before things 'went sour' and [the POPP-II partners] voted to back out after the 'deed was done.' This transfer is effective 1-1-87."

Plaintiffs contend that the two documents confirm that defendants withdrew from the Battle Rock partnership. Defendants testified, however, that they had not received the documents, so the documents establish nothing about their participation in the partnership.

The trial court believed defendants, as do we. We generally defer to credibility decisions by trial courts because they are able to view the testimony of the witnesses whose credibility is at issue. *See, e.g., Dan Bunn, Inc. v. Brown*, 285 Or 131, 145, 590 P2d 209 (1979). That would be a sufficient basis for us to resolve the dispute in this case, but inconsistencies in the documentary evidence persuade us as well.

The November 18, 1986, letter from Roselius to the Chetco Federal Credit Union, which asked the credit union to revise the loan documents for the Battle Rock Motel, contains the following handwritten notation by Roselius:

"[Defendants] asked, upon receipt of [a] copy of this, that their $5000 input be reversed as of 1-1-87 & credited as POPP-II units."

That indicates that defendants asked to convert their Battle Rock investment into POPP-II units in *November 1986*. That

conflicts, however, with the August 1986 letter to the POPP-II partners in which Roselius asserted that defendants had made that request by *August 1986*.

Moreover, the November 1986 letter to the bank and the purported August 1986 letter to the POPP-II partners conflict in a more fundamental way. The former tells the bank in November 1986 that plaintiffs and defendants are proceeding with the purchase of the motel and asks the bank to revise the loan documents for the project to delete the names of the other POPP-II partners who have withdrawn from it. Yet the latter states that defendants had joined the other POPP-II partners in withdrawing from the Battle Rock project in August 1986. Roselius tried to explain the discrepancy, but his explanation is unconvincing.[1] Furthermore, defendant LaRona Hoehne testified that the January 1987 letter from Roselius to defendants that allegedly confirmed their request to convert their Battle Rock investment into POPP-II units was inconsistent with the rest of the correspondence that they had received from Roselius over the years, in that it was handwritten and on different stationery.

We conclude that defendants had a 20 percent interest in a partnership with plaintiffs to own and operate the Battle Rock Motel.[2] We therefore affirm the trial court's decision that defendants are entitled to receive their 20 percent interest in that partnership through its dissolution at the end of 1993.

Were there any doubt about the issue, it is resolved by consideration of the parties' respective positions on defendants' interest in the POPP-II partnership. Plaintiffs and defendants agree that defendants own 21 units in POPP-II. They disagree, however, on the source of those units.

---

[1] The letter to the bank also included updated financial information from Roselius and explained that financial information submitted to the bank by defendants in June 1986 was still current. It would make no sense to ask the bank to rely on defendants' financial position in November 1986 in deciding whether to delete the other POPP-II partners from the note held by the bank on the Battle Rock loan, as the letter did, if defendants had asked to withdraw from the project in August 1986.

[2] Assuming that defendants had an interest in the Battle Rock partnership, the parties raise no issue on appeal about whether the 20 percent interest found by the court is the correct percentage of defendants' interest in it.

■ Plaintiffs contend that defendants' interest consists of the 15 units originally purchased by defendants, one earned by them as a "reserve" unit for work for the partnership and five converted from their investment in the Battle Rock Motel. Defendants contend that their units consist of their original 15 units and six reserve units. The trial court found in favor of defendants on the issue, as do we.

During POPP-II's formation, blocks of units were reserved for various partners to be earned by their noncash contributions to the partnership. Defendants were allocated five of those reserve units in April 1987, effective January 1, 1986. That allocation is reflected in an April 15, 1987, letter from Roselius to defendants. A 1986 K-1 tax form for POPP-II accompanied the letter, showing a $5,000 increase in defendants' capital account, which represents five $1,000 units.

Plaintiffs contend, however, that, although the five units were allocated in 1986, they were to be distributed to defendants at the rate of one per year.[3] One year later, Roselius sent defendants a letter advising them that they had been allocated an additional unit in POPP-II. According to plaintiffs, that unit was the first unit that defendants had earned of the five that had been allocated to them in 1986.

Tellingly, however, Roselius had prepared a January 15, 1988, document for POPP-II entitled "Distribution of Shares as of December 31, 1987," that listed defendants as owning 21 units in POPP-II, "includ[ing] 6 granted reserve units for work over [the] life of the [p]artnership." That entry accords with defendants' understanding of their ownership interest in POPP-II and is consistent with the April 1986 and April 1987 letters from Roselius to defendants that had allocated a total of six reserve units to them.

---

[3] Plaintiffs claim support for their position from a handwritten notation by Roselius at the bottom of the April 15, 1987, letter, which said that the units were to be distributed to defendants' capital account at the rate of one per year. We assign no weight to that entry because we conclude that Roselius added it to a copy of the letter after he had sent the original to defendants. Moreover, plaintiffs never did explain why the April 1987 letter and accompanying K-1 form reflected a $5,000 increase in defendants' POPP-II capital account on January 1, 1986, if defendants were entitled to receive only one-fifth of that amount each year over the next five years.

Roselius later prepared a modified version of that document for his records that altered the entry about the reserve units to list only one of defendants' 21 units as a reserve unit. Roselius tried to explain the discrepancy, but we conclude that the alteration represents an attempt to rewrite the record after the dispute with defendants had arisen. We conclude, as did the trial court, that the 21 units that defendants own in POPP-II consist of the 15 that they had originally purchased and six reserve units that were allocated to them.

Finally, we turn to defendants' interest in the Rainbow Restaurant joint venture. Plaintiffs contend that the trial court erred in awarding defendants $12,808 for their interest in it. They argue that the court should have awarded $20,346 to *plaintiffs*, which represents defendants' share of the losses incurred by the joint venture as of the date of its dissolution.

■ The resolution of that issue turns on whether the parties agreed that defendants would not be responsible for losses incurred by the joint venture. Defendants contend that that was their agreement, which meant that loans obtained by the joint venture to cover operating losses were not an obligation for which defendants were responsible on dissolution of the partnership.

LaRona Hoehne testified as follows on that point:

"Q. Well, but was there not then a financial obligation that you would be incurring to buy the [restaurant]?

"A. No. That was one of the ways he talked us into it. He [assured] us that we would never, ever have any financial obligation whatsoever. That's the only reason we finally agreed to do it.

"* * * * *

"Q. You and your husband signed that joint venture agreement that's in evidence between you—with you and the [plaintiffs], is that right?

"A. Yes, we did.

"Q. What—when you signed that, what was your understanding [about] your financial responsibility for the on-going operation of the restaurant?

"A. None."

Plaintiffs counter that that agreement on losses contradicts a provision in the written joint venture agreement, which provides that the

"[w]ithdrawal of net operating profits, after debt service but before depreciation, *and the attribution of net taxable profits and losses* for the purpose of including same in federal and state income tax returns shall be in accordance with the respective ownerships as of the year of such withdrawals and accounting."

(Emphasis supplied.) Consistent with that provision, defendants took deductions on their 1986 through 1988 tax returns for their share of losses incurred by the joint venture in those years.

Contrary to plaintiffs' view, the provision on the allocation of losses for tax purposes does not contradict the parol agreement on operating losses to which defendants testified.[4] Nothing in the written agreement specifies how operating losses are to be allocated among the partners. The agreement provides only that

"the attribution of net taxable profits and losses *for the purpose of including the same in federal and state income tax returns* shall be in accordance with the respective ownerships [of the parties]."

(Emphasis supplied.) How the parties agreed to attribute losses and profits for tax purposes has no necessary correlation with how profits and losses were to be allocated during the term of the partnership or on its dissolution.

■■ A joint venture is a partnership for a single transaction, and partnership law controls the parties' relationship. *Widmer Brewing Co. v. Rolph,* 128 Or App 666, 671, 877 P2d 112, *rev den* 320 Or 110 (1994). In a partnership, " '[w]here

---

[4] Plaintiffs raised no issue on appeal about whether the agreement on which defendants relied to avoid any liability to plaintiffs for joint venture losses violates the parol evidence rule, ORS 41.740, and we express no opinion on that issue.

parties engage in a common undertaking or business, with the understanding that they are to divide the profits, it follows naturally, *in the absence of any specific understanding to the contrary*, that they must share the losses.' " *Eldridge et al. v. Johnston*, 195 Or 379, 394, 245 P2d 239 (1952) (emphasis supplied; citation omitted); ORS 68.310(1).[5] The understanding to which defendants testified on the sharing of losses is such a contrary understanding.

Plaintiffs also argue that we should reject defendants' testimony on this issue as not credible. However, even on *de novo* review, we give considerable weight to the trial court's findings on credibility. The trial court found defendants' testimony to be more credible. The record provides no reason to question that conclusion. We agree, therefore, with the trial court's conclusion that defendants are entitled to recover $12,808 for their interest in the Rainbow Restaurant joint venture.

Affirmed.

---

[5] ORS 68.310(1) provides:

"The rights and duties of the partners in relation to the partnership shall be determined, *subject to any agreement between them*, by the following rules:

"(1) Each partner shall be repaid the contributions of the partner, whether by way of capital or advances to the partnership property and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied and, except as provided in ORS 68.270, the partner must contribute towards the losses, whether of capital or otherwise, sustained by the partnership according to the share in the profits of the partner."

(Emphasis supplied.)