Argued and submitted October 2, 1985, reversed and remanded to trial court for
further proceedings August 5, reconsideration denied September 16, 1986

MATTSON,
*Petitioner on Review,*

CASCADE LOGGING CORP.,
*Appellant,*

*v.*

COMMERCIAL CREDIT BUSINESS LOANS, INC.,
*Respondent on Review.*

(TC 8303-01531; CA A32139; SC S31706)

723 P2d 996

Quinton F. Mattson, *pro se,* Milwaukie, argued the cause for petitioner on review.

John M. Berman, Beaverton, argued the cause for respondent on review.

CAMPBELL, J.

## CAMPBELL, J.

This case involves conversion of lumber and the payment to defendant of the proceeds from the converted lumber. Plaintiffs,[1] owners of the converted lumber, sought recovery of the proceeds from the sale of the lumber from the defendant creditor of the converter based on two claims for relief. The first was labeled money had and received, pursuant to which plaintiffs requested actual and punitive damages. The second, which was labeled unjust enrichment, requested a constructive trust.

Plaintiffs and West Coast Lumber Sales, which is not a party to this action, had a contract whereby West Coast would cut plaintiffs' logs at plaintiffs' site for orders pre-sold by West Coast and approved by plaintiffs. In May 1980, West Coast removed 285,000 board feet of lumber from plaintiffs' site without plaintiffs' approval. In September 1980, plaintiffs sued West Coast seeking only money damages for conversion of the lumber. Plaintiffs did not seek replevin, or an injunction to prevent the sale of the lumber, or a constructive trust on the proceeds.

In February 1981, while the litigation between plaintiffs and West Coast was pending, Commercial Credit, defendant in this action, opened a line of credit for West Coast which was secured by inventory and accounts. West Coast's attorney advised defendant of the pending litigation between plaintiffs and West Coast, but the attorney advised defendant that the existence of the litigation did not prevent defendant from making a loan to West Coast so long as plaintiffs were making no claim to the collateral on which defendant was relying in making the loan. In June 1982, plaintiffs won a judgment for $192,011.17 against West Coast for conversion. Shortly thereafter, West Coast filed a petition for bankruptcy.

Under the terms of the accounts receivable contract between West Coast and defendant, all money received by West Coast was turned over to defendant; defendant would

---

[1] Plaintiffs Mattson and Cascade Logging Corporation were represented by an attorney at the trial court and Court of Appeals. Mattson appeared *pro se* before this court. Although Mattson can represent only himself and not Cascade Logging Corporation in a *pro se* action (*see* ORS 9.320), in order to avoid confusion we use the designation "plaintiffs" throughout the opinion.

then make fresh advances. During the one and one-half years that the contract was in operation, defendant loaned West Coast approximately $2,000,000 more than it received back. Defendant declared West Coast in default in July 1982.

During the pendency of the bankruptcy proceeding, plaintiffs learned that defendant claimed a security interest in all of West Coast's inventory, including the converted lumber and the money generated from the sales of the converted lumber. In March 1983, plaintiffs filed this action asserting a claim against the proceeds West Coast received from the sale of the converted lumber which, plaintiffs asserted, defendant received as part of the revolving credit arrangement with West Coast.

Defendant moved for summary judgment and the trial court granted the motion. The Court of Appeals affirmed without opinion. We reverse and remand.

I. SUMMARY JUDGMENT

The trial judge did not state the reason for granting defendant's motion for summary judgment. ORCP 47. Plaintiffs claim that summary judgment could have been based on one of two arguments which defendant presented to the trial court. First, plaintiffs were not entitled to the money generated by the sale of the converted lumber because defendant had a security interest in those proceeds under its accounts receivable financing arrangement with West Coast. Second, even in the absence of a valid security interest, plaintiffs could not recover proceeds from the sale of converted property from third parties; plaintiffs were limited either to recovering the converted lumber from third parties to whom it had been sold, or to recovering the proceeds from such sales from the converter. Plaintiffs contend that the granting of summary judgment on either of these bases was error.

Defendant asserts two other possible bases for the trial court's grant of summary judgment. Plaintiffs may have been barred by laches or by entrusting the lumber to West Coast, thereby giving it actual or apparent authority to sell the lumber to third parties.

II. SECURITY INTERESTS IN PROCEEDS

Plaintiffs deny that defendant had a valid security interest in the proceeds from the sale of the converted lumber.

ORS 79.2030(1) defines three conditions which must exist before a security interest can attach:

"(a)    The collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement * * *;

"(b)    Value has been given; and

"(c)    *The debtor has rights in the collateral."*

(Emphasis added.)

Plaintiffs cite two cases for the proposition that one without authorization to use collateral cannot grant a valid security interest in the property, *Valu-U Const. Co. of S.D v. Contractors, Inc.,* 213 Neb 291, 328 NW2d 774, 777 (1983); *Manger v. Davis,* 619 P2d 687, 693 (Utah 1980). This, plaintiffs contend, is consistent with ORS 72.4030(1), which provides in part:

"A purchaser of goods acquires all title which the transferor had or had power to transfer * * *. A person with voidable title has power to transfer a good title to a good faith purchaser for value."

Plaintiffs' position is that although a voidable title may transfer a good title, a void title, which is what the converter West Coast had here, cannot pass any title.

Plaintiffs further argue that defendant's security interest in West Coast's accounts could not encompass proceeds from the sale of plaintiffs' property because that would be inconsistent with the definition of "account" in ORS 79.1060. Under ORS 79.1060, "account" means "any right to payment for goods sold." Plaintiffs contend that because West Coast, as a thief, had no "right to payment" from third parties for stolen goods, defendant's security interest could not cover such money.

Defendant asserts that an exception to the rule that a thief cannot pass good title is that a thief can pass good title to money or negotiable instruments. Defendant cites Restatement (Second) Torts, § 229, comment *d,* which provides in part that:

"* * * no legal interest can ordinarily be acquired in a chattel other than current money or a negotiable instrument, by dealing with one who has stolen it."

Defendant analogizes, "If good title to converted money can be passed to third parties, good title to proceeds can also be passed." Defendant points to *Bk. of Cal. Etc. v Portland H. & W. Co.*, 131 Or 123, 282 P 99 (1929), as support for its contention that Oregon law protects recipients of money from third party claims. That decision, however, does not hold that Oregon law protects all recipients of money from third party claims. Rather, *Bk. of Cal. Etc.* dealt with the Negotiable Instruments Law involving holders in due course. No holders in due course are involved in the present case; thus *Bk. of Cal. Etc.* is not applicable. Moreover, defendant's security interest purported to cover lumber and accounts receivable, not money per se.

■     The third requirement for attachment of a security interest is that the debtor have rights in the collateral. West Coast as a converter had no rights in the collateral (not even voidable title) and could not pass any title even to a good faith purchaser.[2] *See* White and Summers, Uniform Commercial Code 141 (2d ed 1980); 3 Anderson, Uniform Commercial Code 555 (1983); *In Re Samuels & Co., Inc.*, 510 F2d 139, 150 (5th Cir 1975); *Schrier v. Home Indemnity Co.*, 273 A2d 248 (DC App 1971); *McDonald's Chevrolet, Inc. v. Johnson*, 176 Ind App 399, 376 NE2d 106 (1978); *Inmi-Etti v. Aluisi*, 63 Md App 293, 492 A2d 917 (1985); *Bay Springs Forest Products, Inc. v. Wade*, 435 So2d 690 (Miss 1983); *O'Keefe v. Snyder*, 83 NJ 478, 416 A2d 862, 867 (1980). Thus defendant had no security interest which could prevail over plaintiffs' claimed rights to proceeds from the sale of the converted lumber. Summary judgment, if entered on this theory, was inappropriate.

## III.   PLAINTIFFS' ENTITLEMENT TO RECOVER PROCEEDS

The trial court may also have granted summary judgment on the basis that, even in the absence of a valid

---

[2] As Professor Hawkland notes:

"If a thief stole goods from the true owner, he, the thief, acquired nothing ('void' title), and the true owner remained with full ownership rights and not with a mere equity of rescission. The sale by the thief to a bona fide purchaser did not affect these rights in this situation."

2 Hawkland, Uniform Commercial Code Series § 2-403:01 (1982).

security interest, plaintiffs could not recover proceeds from the sale of the converted property from third parties. Plaintiffs assert that they are entitled to recover identifiable proceeds based on the theories of tracing rights and unjust enrichment.

## A. *Tracing*

In moving for summary judgment, defendant argued that such tracing and recovery of proceeds are not permitted at common law. Although we have found no cases involving the precise fact situation involved here, there are cases which have permitted tracing and recovery from third parties. As one writer has noted:

> "As far back as 1705, courts have held that the victim of conversion could recover the proceeds from the sale of the converted property by the wrongdoer. The early cases justified the result through a fiction that the plaintiff could 'suppose the sale made by his consent, and bring an action for the money [so obtained], as money received to his use.' *Lamine v Dorrell*, 2 Ld Raym. 1216, 92 Eng Rep 303 (1705). Modern cases base recovery of the sale proceeds on the principle of unjust enrichment."

Oesterle, *Deficiencies of the Restitutionary Right to Trace Misappropriated Property in Equity and in UCC § 9-306*, 68 Cornell L Rev 172, 219 (1983).

In addition, tracing doctrine operates against innocent transferees who receive no legal title and transferees who are not bona fide purchasers and receive legal but not equitable title. If either type of transferee exchanges the acquired property for other property, or receives income from the acquired property, tracing may apply. *See* Restatement of Restitution §§ 204, 205 (1937); *see also* Oesterle, *supra*, 68 Cornell L Rev at 183.

As Professor Palmer notes, "There is no theoretical limit on the number of transactions or changes in form through which the claimant will be allowed to trace." 1 Palmer, Law of Restitution 178 (1978). For example,

> "In a decision of the Third Circuit the president of the plaintiff corporation misappropriated $170,000 of its funds, bought bonds with the money, and transferred the bonds to the two defendant corporations which he organized and controlled. The proceeds from the sale of these bonds were

used in part by the defendants to develop and perfect inventions and patents; in addition, the remaining assets of the defendant corporations were found to be the product of the bonds. The court ordered specific restitution of the patents, inventions, and all other assets of the defendant corporations. [*Flannery v. Flannery Bolt Co.*, 108 F2d 531 (3d Cir 1939)]."

*Id.*

Professor Goode notes that under English law an owner may follow proceeds from the disposition of converted property into the hands of a third party. Goode, *The Right to Trace and Its Impact in Commercial Transactions - I*, 92 L Q Rev 360, 376 (1978). Goode also provides the following example with facts similar to those involved in this case:

"Suppose, for example, that B, holding goods as O's bailee, wrongfully sells them to T1 and passes the proceeds to T2, who takes as a volunteer or with notice of B's breach of duty. Here there are infringements of no less than four different rights vested in O; a right to possession of the original goods against B; a like right against T1; a right to require B to account for the proceeds; and a like right against T2. Possible remedies open to O are (i) against B, a claim for damages for conversion of the goods, a personal claim at common law to the proceeds as money had and received, and a personal claim in equity to account for the proceeds as a constructive trustee; (ii) against T1, a claim for damages for conversion, or a claim for delivery up of the goods and damages for their detention; (iii) *against T2, a personal claim at common law for money had and received and a proprietary claim in equity by way of a tracing order.*"

Goode, *The Right to Trace and Its Impact in Commercial Transactions - II*, 92 L Q Rev 528, 541 (1978). (Emphasis added.) Defendant's position in this case is analogous to "T2."

Defendant argues that the tracing of proceeds of converted goods in the hands of third party transferees should not be permitted because "the parties liable would increase like an inverted pyramid ever upward and outward" making such tracing commercially impracticable. Defendant asserts that under plaintiffs' theory if West Coast had used the proceeds from the sale of the converted lumber to pay its employees, its employees would be liable to plaintiffs. Similarly, each lumber company that bought plaintiffs' lumber

presumably later resold it and used those proceeds to pay its bills. Defendant argues that under plaintiffs' theory the creditors of subsequent converters who are paid with those proceeds are also liable.

■       Defendant's commercial impracticability argument ignores the reality that tracing of proceeds into the hands of third, fourth, fifth, etc. party transferees is permitted under the Uniform Commercial Code. ORS 79.3060(2) indicates that tracing proceeds into the hands of remote transferees is considered commercially practicable. ORS 79.3060(2) provides:

> "(2)   Except where ORS 79.1010 to 79.5070 otherwise provide, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor."

Tracing proceeds into the hands of third party transferees is routinely sanctioned in a variety of UCC contexts. *See, e.g., In Re Guaranteed Muffler Supply Co., Inc.,* 1 Bankr 324, 27 UCC Rep 1217 (Bankr N D Ga 1979) (permitting secured creditor to trace proceeds from sale of debtor's inventory and accounts into hands of third-party transferee); *Baker Prod. Credit v. Long Cr. Meat,* 266 Or 643, 513 P2d 1129 (1973) (allowing creditor with security interest in farm products to recover proceeds from sale of products from third-party transferees).

■       Defendant's argument also ignores the fact that a bona fide purchaser would cut off plaintiffs' tracing rights. *See Lane County Escrow v. Smith, Coe,* 277 Or 273, 285, 560 P2d 608 (1977). Section 208(1) of the Restatement on Restitution provides:

> "(1)   Where a person wrongfully disposes of property of another knowing that the disposition is wrongful and in exchange therefore other property is transferred to a third person, the other can enforce a constructive trust or an equitable lien upon the property, unless the third person is a bona fide purchaser."

The creditors or employees of the companies that bought the lumber are analogous to purchasers in that they

are exchanging their services for money. If they "purchased" in good faith without knowledge that the money they received was proceeds from stolen property, they would be like bona fide purchasers and thus would also cut off plaintiffs' tracing rights.[3]

■     Whether defendant is a bona fide purchaser cutting off plaintiffs' tracing rights is a question of material fact which precludes summary judgment. An innocent purchaser is one who has no reasonable grounds to suspect that the person from whom he buys an article did not have good title. *Treit v. Ore. Automobile Ins. Co.,* 262 Or 549, 499 P2d 335 (1972). As this court noted long ago, whether one is a purchaser in good faith is an issue of fact that must be determined from many circumstances, including actual and constructive notice and suspicious circumstances. The facts surrounding the transaction, including any unusual or peculiar business methods of the vendor that were known to the purchaser, may properly be submitted to the jury to be considered on the ultimate question of good or bad faith. *Raymond v. Flavel,* 27 Or 219, 40 P 158 (1895); *Bowman v. Metzger,* 27 Or 23, 39 P 3 (1895).

According to depositions and affidavits submitted by the parties, West Coast applied to defendant in January 1981, for a line of credit. As part of this application West Coast provided a letter from West Coast's attorney stating that plaintiffs had filed an action for willful conversion of Douglas Fir lumber against West Coast. Thus defendant knew of plaintiffs' claim for conversion against West Coast. Accordingly, defendant was on notice that if plaintiffs prevailed on their claim, some portion of the payments on account which defendant received might represent proceeds from the sale of stolen property. Defendant admits that it received notice that the action was pending, but notes that it had received an explanatory letter from West Coast's attorney and it felt that the existence of the litigation for money damages did not prevent it from making a loan so long as no claim was being asserted to the collateral upon which it was relying.

---

[3] Two English scholars have similarly noted:

"It seems correct in principle that a person, whose money is used to pay off creditors, who have no notice of his claim, should lose his right to trace, for, in such circumstances, the creditors are in the position of bona fide purchasers."

Goff & Jones, The Law Of Restitution 55 (1966).

The fact that defendant knew of the pending litigation is undisputed. However, reasonable persons could draw different inferences and conclusions from this undisputed fact regarding whether defendant had acted in good faith and was thus a bona fide purchaser cutting off plaintiffs' tracing rights.

In addition, plaintiffs' right to recover under a tracing theory is limited by their ability to trace the proceeds from the converted lumber. If they cannot trace the proceeds to defendant then they cannot recover under this theory. Plaintiffs submitted evidentiary materials to the trial court describing how such tracing could be established. Defendant claims that the proceeds from the sale of the converted lumber have long since passed through its hands to undetermined third parties. Plaintiffs' ability to identify and trace proceeds from the sale of the converted lumber is evidentiary, a matter of proof. It is not an appropriate basis for summary judgment.

### B. *Unjust Enrichment/Money Had and Received*

Plaintiffs argue that because West Coast never obtained title, voidable or otherwise, to the lumber, it could not transfer the lumber or its proceeds to any security interest holder. To the extent that defendant received funds based on its asserted interest in plaintiffs' property, it has been unjustly enriched. Plaintiffs argued that defendant's receipt and retention of proceeds from plaintiffs' converted lumber supports liability on the theories of money had and received and unjust enrichment.

Defendant asserts that this court has stated on two occasions that when a secured creditor is faced with a claim of unjust enrichment, the secured creditor prevails. *Community Bank v. Jones,* 278 Or 647, 670, 566 P2d 470 (1977); *Evans Products v. Jorgensen,* 245 Or 362, 372, 421 P2d 978 (1966). We need not address whether defendant's characterization of those cases is accurate because we conclude that defendant had no security interest in the converted lumber.

Defendant also argued that where one of two parties must bear the loss caused by a third party's wrongdoing (here, West Coast), the loss should fall on the party with knowledge and in the better position to avoid the loss by policing the wrongdoer's conduct. Defendant claims that plaintiffs could have avoided the loss by asserting either a request for claim

and delivery, for an injunction to prevent the sale of the lumber, for a constructive trust on the proceeds, for an equitable lien, or for replevin.[4]

Plaintiffs agree that when there is a dispute between two essentially innocent parties the one who was in the best position to prevent the loss should bear it. Plaintiffs argue that defendant was in the best position to prevent the loss. Plaintiffs assert that they had no ability to control the actions of West Coast. Conversely, according to plaintiffs, defendant voluntarily entered into its financing arrangement knowing of plaintiffs' claims for conversion and was on notice that if plaintiffs prevailed on their claim, some portion of the payments on account which defendant received would represent proceeds from the sale of stolen property. Thus plaintiffs assert that the burden of loss must fall on defendant because it was in a position to investigate the validity of plaintiffs' conversion claims, to police West Coast's conduct, and to avoid the ultimate loss.

■ In this case, both plaintiffs and defendant will suffer because of West Coast's conversion and subsequent activities. Plaintiffs have lost lumber valued at $192,011.17. Defendant lost approximately $2,000,000 which it had loaned West Coast on a revolving credit basis. Although defendant lost more money than did plaintiffs, that does not indicate that defendant has not been unjustly enriched; defendant may have lost $192,011.17 less than it would have otherwise. As plaintiffs argue, defendant is not entitled to keep plaintiffs' property to make its loss less painful.[5]

■ Defendant has been enriched by West Coast's actions if defendant received proceeds from the sale of the converted lumber in which it had no security interest and if it was in the

---

[4] During argument before this court, plaintiffs contended that they had to assert a remedy for money judgment rather than a lien because West Coast refused to tell plaintiffs where the property was and whether it had been sold. Plaintiffs assert that they could not establish a lien on property that they could not identify.

[5] Commercial Credit can seek a remedy against West Coast. Commercial Credit has contractual remedies for breach of warranty against West Coast and indemnity rights against West Coast's principal, Ronald Thompson, and his wife, as individual guarantors of West Coast's obligations.

best position to prevent the loss.[6] Whether defendant or plaintiffs were in the best position to prevent the loss is a question of fact. Summary judgment on this basis would be inappropriate.

## III.  LACHES

Defendant asserts that summary judgment was appropriate because plaintiffs' claims were barred by laches. In order to prevail on its defense of laches, defendant must have been able to establish the following three elements: (1) plaintiffs delayed asserting their claim for an unreasonable length of time, (2) with full knowledge of all relevant facts (and laches does not start to run until such knowledge is shown to exist), (3) resulting in such substantial prejudice to defendant that it would be inequitable for the court to grant relief. *Stephan v. Equitable S & L Assn.,* 268 Or 544, 569, 522 P2d 478 (1974).

Defendant contends that plaintiffs delayed asserting an interest in the lumber for almost three years after the conversion by West Coast. Rather than seeking an equitable lien or a constructive trust against West Coast, plaintiffs decided to sue for money judgment. Defendant suggests that this delay was unreasonable because it permitted the lumber to be sold to innocent third parties and the proceeds to be paid to defendant.

Defendant also contends that it suffered substantial prejudice as a result of the delay, and because of West Coast's bankruptcy it is difficult for defendant to determine whether a conversion ever occurred. According to the defendant, because the prior trial between plaintiffs and West Coast is not binding on defendant (because it was not a party), defendant would now be required to litigate a very stale claim.

The present record reflects disputed issues of material fact on each of the three elements required to establish laches. First, there is a dispute regarding when plaintiffs obtained "full knowledge of all the facts," specifically including the extent of defendant's asserted interest in West Coast's

---

[6] If the proceeds cannot be traced because defendant has expended the money, there is nothing upon which a constructive trust could be imposed. However, plaintiffs may still be entitled to a money judgment if defendant was unjustly enriched. *See Johnson v. Steen,* 281 Or 361, 372, 565 P2d 141 (1978).

accounts. Plaintiffs assert that only after West Coast filed for bankruptcy in July 1982, did plaintiffs learn the full extent of defendant's supposed interest.

Second, plaintiffs contend that they did not "delay for an unreasonable length of time" in acting to assert their claims against defendant. Plaintiffs first asserted their claims against defendant three months after learning of defendant's alleged interest, by a complaint filed in West Coast's bankruptcy proceeding, in October 1982. (*West Coast Lumber Sales, Inc.,* U S Bankr D. Or. No. 382-02323, Adversary hearing No. 82-0737). After the bankruptcy court declined to consider various claims on jurisdictional and abstention grounds, plaintiffs filed the present action in March 1983.

What is an unreasonable length of time is determined by examining all circumstances. Although equity is said not to be bound by statutes of limitations, those statutes are generally applied by analogy when laches is asserted. *Albino v. Albino,* 279 Or 537, 553, 568 P2d 1344 (1977); *Hanns v. Hanns,* 246 Or 282, 306, 423 P2d 499 (1967). Here the applicable statute of limitations is two years, ORS 12.110(1).

Finally, there is a genuine issue of fact regarding defendant's claim that it was so substantially prejudiced by any delay that plaintiffs, as a matter of equity, should be denied relief. The harm or prejudice to a defendant necessary to the laches defense can be either a disadvantageous change in position or loss of witnesses or critical documentary evidence caused by plaintiffs' delay. *Hanns,* 246 Or at 309.

Under the circumstances of the present case, drawing all reasonable inferences in plaintiffs' favor, there is at least a factual issue regarding whether any prejudice defendant suffered was the result of plaintiffs' delay or its own negligence and inaction. The record contains a number of unresolved factual issues. If the trial court entered summary judgment on the laches defense, that ruling was erroneous.

## IV. ENTRUSTMENT/AUTHORITY

Defendant also cites ORS 72.4030(3) and (4) dealing with entrustment and contends that plaintiffs' own evidence establishes that West Coast was granted actual and apparent authority to sell the lumber. Actual authority, defendant avers, is contained in an April 22, 1980, letter agreement

between plaintiffs and West Coast involving the general sale of lumber.

Plaintiffs, on the other hand, produced affidavits stating that the letter agreement of April 22, 1980, allowed West Coast to remove lumber only if West Coast first gave plaintiffs documentation of the amount and grade of lumber involved in the sale. Plaintiffs assert that those conditions were not satisfied with regard to the stolen lumber. Plaintiffs also note that in the conversion litigation between plaintiffs and West Coast, the latter never asserted that it removed the lumber pursuant to actual or apparent authority under any brokerage or consignment arrangement.

■ Our examination of the April 22 letter leads us to agree with plaintiffs that the letter, standing alone, is insufficient as a matter of law to establish actual authority for West Coast to remove lumber without plaintiffs' prior authorization.

Likewise, as a matter of law, based upon the evidence presented, the defenses of entrustment and apparent authority also fail. ORS 72.4030(3) and (4) involving entrustment provide:

"(3)    Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.

"(4)    'Entrusting' includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting of the possessor's disposition of the goods have been such as to be larcenous under the criminal law."

■ Defendant presented no evidence to indicate that there was either delivery or acquiescence. Plaintiffs indicated that West Coast removed the lumber without plaintiffs' knowledge or permission. West Coast converted the lumber in May 1980. In July, after discovering that West Coast had taken possession of the lumber, plaintiffs demanded that it be returned. Plaintiffs also reported the conversion to various law enforcement agencies. As at least one commentator has noted, the concept of entrusting is based on a knowing delivery or knowing acquiescence. Leary & Sperling, *The*

*Outer Limits of Entrusting,* 35 Ark L Rev 50, 86 (1981). Without delivery or knowing acquiescence there could be no entrustment and West Coast could not convey good title to goods it had converted. *See* Note, *Uniform Commercial Code, Section 2-403(2): The Authority of a Bailee to Convey Title,* 21 U Fla L Rev 241, 246 (1968).

■ Defendant also asserted the affirmative defense that West Coast had apparent authority from plaintiffs to sell the lumber. We have stated the elements necessary to establish apparent authority in *Jones v. Nunley,* 274 Or 591, 595, 547 P2d 616 (1976):

> "Apparent authority to do any particular act can be created only by some conduct of the principal which, when reasonably interpreted, causes a third party to believe that the principal consents to have the apparent agent act for him on that matter. The third party must also rely on that belief."

In *Minniti v. Cascade Employers Assn,* 280 Or 319, 329, 570 P2d 1171 (1977), we noted:

> "* * * it is well established that one cannot rely upon an agent's apparent authority when he knows that the agent does not have actual authority or had knowledge of facts which would put him on inquiry as to the actual authority of the agent."

There is no evidence (and defendant does not assert) that defendant relied on West Coast's apparent authority to sell the lumber when it entered into a security arrangement with West Coast. Before entering into the security arrangement, defendant knew that plaintiffs were suing West Coast for conversion. Also, defendant presents no evidence that the purchaser of the lumber relied on West Coast's apparent authority.

## V. CONCLUSION

In light of these genuine issues of material fact, the grant of summary judgment to defendant was error. The decision of the Court of Appeals is reversed. The case is remanded to the trial court for further proceedings.