Argued and submitted July 1, affirmed on appeal; reversed in part and otherwise affirmed on cross-appeal December 11, 1996

GENDER MACHINE WORKS, INC.,
an Oregon corporation,
*Respondent - Cross-Appellant,*

*v.*

EIDAL INTERNATIONAL SALES CORP., INC.,
an Oregon corporation;
Morbark Industries, Inc.;
Dan Burda, an individual;
Ursula Burda, an individual;
Stephen E. Andersen, an individual;
and Ronald Richter, an individual,
*Defendants,*

*and*

ARCHER DANIELS MIDLAND CO.,
an Illinois corporation,
*Appellant - Cross-Respondent.*

GENDER MACHINE WORKS, INC.,
an Oregon corporation,
*Plaintiff,*

*v.*

The BOEING CORPORATION,
a Delaware corporation;
First Interstate Bank of Oregon, N.A.,
a national banking association;
and Wachovia Bank of North Carolina, N.A.,
dba Wachovia Bank and Trust,
a national banking association,
*Defendants.*

(9210-07025 and 9212-08741; CA A87470)

929 P2d 1033

Keith M. Garza argued the cause for appellant - cross-respondent. With him on the briefs were Richard S. Gleason, Charles F. Adams, and Stoel Rives.

David Buono argued the cause for respondent - cross-appellant. With him on the briefs were Curtis A. Welch and Lindstedt & Buono, P.C.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

HASELTON, J.

## HASELTON, J.

Defendant Archer Daniels Midland Company (ADM) appeals a summary judgment in favor of plaintiff Gender Machine Works (Gender) in an action for breach of contract. Gender cross-appeals from those aspects of the judgment that reduced its recovery through various offsets. We affirm on the appeal and affirm in part and reverse in part on the cross-appeal.

This case arises from ADM's purchase of an industrial shredding machine and its alleged erroneous or misdirected payment for that machine. There are three "players": plaintiff Gender, which was primarily responsible for building the shredder; defendant ADM, the purchaser; and Eidal International Sales Corporation (Eidal), which performed some work on the shredder and sold the shredder.[1]

For the most part, the facts are not in dispute: In late 1991, ADM contacted Eidal about buying a shredder to shred scrap tires for use as fuel at a cogeneration plant at one of ADM's manufacturing facilities. ADM had previously purchased such shredders from Eidal. After some negotiation and discussion, on March 12, 1992, Eidal sent ADM a written offer to sell ADM an Eidal 96-58E shredder for $225,000. Eidal's offer asked ADM to submit a written purchase order for the machine. On March 13, Ron Peterson, an ADM representative, called Eidal and accepted Eidal's offer orally. On April 2, ADM submitted the requested purchase order to Eidal; that purchase order, No. B89-109200083-RP identified Eidal as the vendor. Some time before April 2, and without ADM's knowledge, Eidal and Gender entered into an agreement whereby Gender would complete most of the work on the shredder and would receive the full $225,000 purchase price for its work.[2]

---

[1] Eidal is a defendant in this litigation but, as explained below, it settled with Gender and, thus, is not a party to the appeal.

[2] When Eidal contracted to sell ADM a shredder, it was already indebted to Gender by over $40,000. Thus, apparently to satisfy this preexisting debt and compensate Gender for its substantial work on the shredder, Gender and Eidal agreed that Gender would receive the full $225,000 purchase price from ADM.

On April 3, Eidal faxed ADM the letter that is the focus of the dispute in this case. That letter, addressed to Peterson, read as follows:

"Eidal's joint venture manufacturing partner, Gender Machine is processing a substantial amount of work on this project (Purchase Order B89109200083RP) and this letter is sent to your group informing you that they are authorized by Eidal to submit an invoice with Eidal allowing them to collect the sum of $225,000.00 for work performed by their group on this project.

"Eidal and Gender will invoice jointly with one invoice with payment to be made by ADM in both Gender's and Eidal's names.

"Due to our financing needs, we are requesting this acknowledgment by your group today so that we can get started on this expedited project. We would like to start today.

"If you have any questions regarding this Invoice Request please contact my office. A verbal confirmation would be fine to expedite matters.

"Acknowledgment of Invoice Conditions outlined above:

" _____

" _____

"Please sign both copies and retain one for your records.

"Hard copies in mail."

It is undisputed that, before its receipt of the April 3 letter, ADM had no knowledge of Gender's involvement in the project.

Peterson signed the April 3 letter and returned it to Eidal. In so doing, he handwrote the following notation on the letter:

"As I understand this you want me to pay one amount of $225,000 for my equipment bought against P.O. #B89-1092-00083R.P. and this check should be payable to Eidal/Gender."

On July 3, 1992, the completed shredder was shipped to ADM. On July 6, Eidal sent ADM a standard Eidal

invoice for $225,000, which did not refer to Gender or to the April 3 letter, and simply referred to customer order number B89-1092-00083RP. Eidal then sent the same invoice to Gender with one significant change: On Gender's copy of the invoice, Eidal typed, "make check payable to Eidal and Gender Machine." On August 14, ADM sent Eidal a check for $225,000, made payable to Eidal only. On August 17, Eidal deposited the check into its account.

Shortly after receiving ADM's check, Eidal issued a back-dated check to Gender for $105,000. Although Gender had been working with Eidal on several projects in addition to the ADM shredder and there were open accounts as to those transactions, Eidal did not specify the account to which the $105,000 payment should be applied. Gender cashed the check. By early September, Gender realized that ADM had sent full payment solely to Eidal, rather than to Eidal and Gender jointly, and that Eidal had not passed the entire amount through to Gender.

In October 1992, Gender brought this action, which ultimately raised claims against ADM, Eidal, Eidal's principals, Dan and Ursula Burda, and other defendants who are immaterial to this appeal. Gender's complaint alleged, *inter alia*, claims for breach of contract and fraud against Eidal and the Burdas[3] and breach of contract, including a third-party beneficiary breach of contract claim, against ADM. The thrust of Gender's contractual claims against ADM was that (1) ADM's execution of the April 3 letter gave rise to an enforceable contract by which ADM was obligated to issue a single check jointly payable to Gender and Eidal; (2) Gender was either a "first party" to that contract or a third-party beneficiary of the contract; (3) ADM breached that contract by issuing the August 13 check to Eidal alone, rather than to Eidal and Gender jointly; and (4) Gender had suffered damages of $225,000 because of that breach. In December 1992, Gender filed a parallel action against various participants in a transaction in which the Boeing Corporation purchased an industrial shredder, produced by Gender, from Eidal. In the

---

[3] In addition to asserting claims against the Burdas and Eidal with respect to the ADM transaction, Gender also sought recovery against those parties relating to other projects.

Boeing litigation, Gender alleged, *inter alia*, that Boeing had breached a contractual obligation by failing to secure an authorized endorsement on Gender's behalf of its joint check drawn to Eidal and Gender, and that Gender had suffered damages of $281,917.95 as a result of that breach.[4]

In November 1994, before the entry of the summary judgment that is the subject of this appeal, Gender settled or obtained default judgments on all claims in this action and the Boeing litigation, except for its claims against ADM. In particular, Gender entered into a settlement with Eidal's principals, the Burdas, by which the Burdas agreed to pay Gender $51,250 in return for a release of all claims against them, including claims relating to the Boeing shredder.[5] Although that settlement, as initially proposed, did not release the Burdas from liability for claims relating to the ADM shredder, the final settlement did effect such a release and was structured so that all of the monies the Burdas paid were attributed to the Boeing litigation and none were attributed to the ADM litigation.[6]

After the other claims were settled, Gender moved, and ADM cross-moved, for summary judgment. Gender asserted, *inter alia*, that the April 3 letter, with ADM's confirmation, gave rise to a "first-party" contract between Gender and ADM and that ADM had breached that contract by sending a single-payee check to Eidal rather than a joint check to Gender and Eidal. Alternatively, Gender asserted a parallel third-party contract theory of recovery. ADM countered that there was no "first-party" contract between it and Gender—and, indeed, that it had never dealt with Gender—and, further, that Gender was not an intended third-party beneficiary of any contract between ADM and Eidal. ADM invoked a battery of contractual defenses, including, most materially to this appeal, defenses of payment and nonoccurrence of a condition precedent. In particular, ADM

---

[4] On August 9, 1993, the trial court consolidated Gender's case against ADM, *et al*, with its case against Boeing and others regarding the Boeing shredder.

[5] Dan Burda was in the process of having his debts discharged in bankruptcy during the negotiation of that settlement.

[6] The terms of the Burdas' settlement with Gender are amplified in the discussion of Gender's cross-appeal. 145 Or App at 214.

asserted that: (1) under the April 3 letter and confirmation, tender of a joint invoice was a "condition precedent" of any obligation on ADM's part to issue a joint check and that, because that "condition" had never occurred, ADM's issuance of the single-payee check to Eidal did not effect a breach; and (2) because Eidal and Gender were "joint venturers," ADM's payment to the former satisfied any contractual obligation to the latter. Finally, ADM contended that, even if Gender was entitled to payment, damages were necessarily reduced and offset against both the $105,000 it had received from Eidal and a prorated share ($16,349) of the Burdas' settlement payment.[7]

The trial court granted Gender's motion for summary judgment and denied ADM's cross-motion. The court did not explain its reasons and, particularly, did not state whether Gender was entitled to recover on a "first-party" or "third-party" basis. The trial court reduced Gender's damages ($225,000) by the amount of ADM's asserted offset, yielding a judgment of $103,651.

ADM appeals, challenging the entry of summary judgment on contractual liability. Gender cross-appeals, assigning error to the trial court's reduction of its recovery. We address each in turn.

ADM raises eight assignments of error. The first two assignments assert that, as a matter of law, there was no enforceable "first-party" contract between ADM and Gender, because there was "no material assent, no consideration, and no promise from ADM to Gender." Without dwelling on the matter, we agree with ADM that the April 3 letter and confirmation did not give rise to a contract between ADM and Gender. Until April 3, ADM was unaware of Gender, and the April 3 communication was specifically between ADM and Eidal. Nevertheless, we conclude, as explained below, that

---

[7] The $16,349 figure represented 31.9 percent of the Burdas' total settlement payment ($51,250). That is the same ratio as the amount of Gender's ADM-related damages ($225,000) to Gender's total damages claims arising out of the Burdas' alleged misconduct ($705,030.64). As part of its second assignment of error on cross-appeal, which is addressed below, 145 Or App at 214-16, Gender disputes the accuracy of that calculation. Given our disposition of that assignment of error, we do not reach that argument.

the April 3 exchange modified the payment terms of the pre-existing ADM/Eidal contract so as to require ADM to issue a joint check to Eidal and Gender, and that Gender was a third-party creditor beneficiary of that modification.

ADM's third, fourth, and fifth assignments of error dispute Gender's entitlement, as a third-party beneficiary, to enforce any "joint check" obligation. *See Sisters of St. Joseph v. Russell*, 318 Or 370, 374-75, 867 P2d 1377 (1994) (an incidental beneficiary cannot enforce a contract; enforcing party must be an intended beneficiary). Gender responds that the uncontroverted evidence establishes that, as a matter of law, Gender was the intended creditor beneficiary of ADM's "joint payment" promise and not merely an incidental beneficiary. We agree.

In *Sisters of St. Joseph*, the court described the controlling principles:

> "As a general proposition, a third party's right to enforce a contractual promise in its favor depends on the intention of the parties to the contract. * * * For a plaintiff to be a creditor beneficiary, 'the performance * * * by [the promisor] must be to "satisfy an actual *or supposed or asserted duty* of the promisee * * * to the [plaintiff]." ' " 318 Or at 374-75, *quoting Northwest Airlines v. Crosetti Bros.*, 258 Or 340, 346, 483 P2d 70 (1971) (emphasis supplied, quoting *Restatement of Contracts* § 133, 151-52 (1932)).

In *Northwest Airlines v. Crosetti Bros.*, 258 Or at 345-46, the court endorsed the following formulation from section 133 of the *Restatement of Contracts*:

> "(1)  Where performance of a promise in a contract will benefit a person other than the promisee, that person is[:]
>
> "* * * * *
>
> "(b)  a creditor beneficiary if no purpose to make a gift appears from the terms of the promise in view of the accompanying circumstances and performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary."

Thus, in this case, if (1) ADM and Eidal intended to benefit Gender by issuing a joint check; (2) ADM's performance would have satisfied a duty of Eidal to Gender; and (3) ADM's

performance would have benefitted Gender, Gender was a third-party creditor beneficiary who was entitled to enforce the contract. *See, e.g., Sisters of St. Joseph,* 318 Or at 375.

ADM asserts that the April 3 letter was ambiguous "at best" with respect to those elements and particularly with respect to any intention to "discharge an 'actual or supposed or asserted duty' owed by Eidal to Gender":

> "Where is such language in the Letter? The Letter states only that Gender was 'allowed' 'to collect the sum of $225,000 for work performed by their group on [the ADM] project.' Nowhere does the Letter state that the invoicing and payment conditions were needed to 'allow' Gender to obtain this amount. ADM had no idea that Gender, Eidal's 'joint venture manufacturing partner,' distrusted Eidal. Again, to ADM the invoice and payment conditions were necessitated by 'financing needs' whatever that term meant. For all ADM knew, some bank or other creditor was to be the ultimate recipient and beneficiary of the Invoice Conditions Letter with any benefit to Gender being merely incidental if at all."

We disagree with ADM that the "joint check" obligation is plausibly susceptible to an interpretation that it was not intended to benefit Gender. As Gender observes, joint check obligations are a "classic example of a third-party beneficiary contract." *See, e.g., T.S.I., Inc. v. Metric Constructors, Inc.,* 817 F2d 94, 96-97 (11th Cir 1987) (supplier was a third-party beneficiary of provision in subcontract between general contractor and subcontractor, which provided for issuance of joint check to subcontractor and supplier). The April 3 letter explicitly stated that Gender was performing substantial work on the shredder and further stated that payment was to be made in both Eidal's and Gender's names. Moreover, Peterson's written confirmation for ADM expressly acknowledged his understanding that the single check "should be payable to Eidal/Gender." Thus, Gender was an intended creditor beneficiary of ADM's joint payment obligation.[8]

---

[8] ADM also asserted defenses of lack of consideration and lack of mutual assent. It is unclear from the pleadings and from the appellate briefing whether those defenses were directed only against Gender's "first-party" contractual claim, which was the object of ADM's first and second assignments of error, or also against Gender's third-party beneficiary claim. To the extent ADM relies on those defenses *vis-a-vis* the third-party claim, that reliance is unavailing. Under ORS

■      In its fourth and fifth assignments of error, ADM argues that, even if Gender was a creditor beneficiary, the trial court erred in rejecting ADM's defenses of (1) nonperformance of a condition precedent and (2) payment. With respect to nonperformance of a condition precedent, ADM argues that: (1) the April 3 letter and confirmation "unambiguously" provide that the tender of a joint invoice was the condition precedent of any obligation on ADM's part to issue a joint check; (2) that "condition" never occurred; and (3) consequently, as a matter of law, ADM's issuance of the single-payee check to Eidal did not effect a breach. In addition to that "matter of law" argument, ADM argues that, even if the April 3 letter and confirmation do not unambiguously make the issuance of a joint invoice a condition precedent of the joint payment obligation, the contractual language is, at least, ambiguous in that respect, raising a jury question and precluding summary judgment. Gender responds that the contractual language is unambiguous—and that when the April 3 letter and Peterson's confirming notation are read in combination, it is apparent that the issuance of a joint invoice was not a condition precedent of the joint check payment obligation.

*Dan Bunn, Inc. v. Brown*, 285 Or 131, 590 P2d 209 (1979), frames our inquiry:

> " ' "Conditions precedent" [* * *] are those facts and events, occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available. 3A Corbin, Contracts § 628, p. 16; * * *.'

> "* * * * *

> " 'Whether a provision in a contract is a condition the nonfulfillment of which excuses performance, depends upon the intent of the parties, to be ascertained from a fair and reasonable construction of the language used in

---

72.2090(1), the modification of the payment terms of the ADM/Eidal contract "need[ed] no consideration to be binding." Peterson's written confirmation/acknowledgment on the April 3 letter unambiguously established mutual assent.

the light of all the surrounding circumstances. 5 Williston, Contracts (3d ed.) § 663, p. 127.' " *Dan Bunn, Inc.*, 285 Or at 142-43 (quoting *Ross v. Harding*, 64 Wash 2d 231, 391 P2d 526 (1964)).

Often, but not necessarily or inevitably, conditions precedent are signaled by language "such as 'if,' 'on condition that,' 'provided that,' 'in the event that,' and 'subject to.' " E. Allan Farnsworth, II, *Farnsworth on Contracts* § 8.2, 346 (1990). *See, e.g., Dan Bunn, Inc.*, 285 Or at 143 (use of "subject to" "clearly indicated an intent to impose a condition precedent").

In arguing that the issuance of a joint invoice was a condition precedent of the joint payment obligation, ADM emphasizes that the April 3 letter states that "Eidal and Gender *will* invoice jointly with one invoice" (emphasis supplied) and that the letter expressly requests "Acknowledgment of Invoice *Conditions* outlined above" (emphasis supplied). Notably, however, the letter refers only to joint payment and does not, by its terms, refer to or contemplate issuance of a single-payee check. That is, there is no suggestion in the letter that, unless or until a joint invoice was issued, ADM could pay Eidal alone.

Whatever abstract attraction ADM's argument might have when the April 3 letter is viewed in isolation vanishes when the letter and Peterson's handwritten acceptance on ADM's behalf are read together. Peterson confirmed ADM's understanding of the modification of the payment term simply and without qualification: "[Y]ou want me to pay *one amount of $225,000* for my equipment bought against P.O. #B89-1092-00083R.P. *and this check should be payable to Eidal / Gender*." (Emphasis supplied.)

In combination, the April 3 letter and ADM's acceptance of the modification proposed in that letter are not reasonably susceptible to the construction ADM now ascribes to them. Rather, their meaning "is so clear that it precludes doubt by a reasonable person." *Northwest Pine Products v. Cummins Northwest, Inc.*, 126 Or App 219, 223, 868 P2d 21 (1994). ADM was obligated to issue one joint payment to Eidal and Gender; that obligation was not conditioned on the issue of a joint invoice, so as to permit ADM, in the absence of

a joint invoice, to issue a nonjoint payment. The trial court correctly rejected ADM's condition precedent defense.[9]

■ ADM next contends that the trial court erred in rejecting its "payment" defense. As we understand it, ADM makes three somewhat related arguments. First, Gender, as a third-party beneficiary, "steps into the shoes" of the promisee, Eidal, and, thus, is generally subject to contractual defenses ADM could assert against Eidal. Second, given Eidal's representation in the April 3 letter that Gender was its "joint venture manufacturing partner," Eidal's receipt and acceptance of ADM's payment precludes any claim by Gender against ADM for nonpayment. Third, ADM argues that Eidal was Gender's agent for purposes of receiving payment for the shredder.

With respect to ADM's first argument, Gender acknowledges that claims by third-party beneficiaries may be subject to certain defenses that the promisor could assert against the promisee. Nevertheless, Gender argues that, if a third-party beneficiary asserts a breach of a joint payment obligation, a defense of payment cannot preclude the third-party claim:

> "If ADM's theory were the law, the promisor under a Joint Check Agreement would never be liable for issuing payment solely to one of the joint payees. Thus, the other payee would have no legal protection, and a promisor's obligation would be illusory."

Gender also invokes section 309 of the *Restatement (Second) of Contracts* for the proposition that a defense of payment is not available against a third-party beneficiary.[10]

---

[9] *See also Vrla v. Western Mortgage Co.*, 263 Or 421, 422-23, 502 P2d 593 (1972) (contract that provided that architect was to be paid "from the proceeds of a construction loan" to be obtained by defendant did not establish a condition precedent for the architect's receipt of payment).

[10] *Restatement (Second) of Contracts* section 309 at 458, provides:

> "(1) A promise creates no duty to a beneficiary unless a contract is formed between the promisor and the promisee; and if a contract is voidable or unenforceable at the time of its formation the right of any beneficiary is subject to the infirmity.

> "(2) If a contract ceases to be binding in whole or in part because of impracticability, public policy, nonoccurrence of a condition, or present or prospective failure of performance, the right of any beneficiary is to that extent discharged or modified.

Neither party points to Oregon authority supporting its position, and we are unaware of any. Nonetheless, and without either accepting or rejecting the approach set out in *Restatement (Second)* section 309, we find Gender's practical argument to be compelling. ADM has not identified any persuasive reason why a promisor should be permitted to breach a joint payment obligation and then assert a defense of payment against the unpaid joint obligee. We perceive none.

■ ADM's "joint venture" and "agent for payment" arguments similarly fail. Assuming, without deciding, that Eidal and Gender were "joint venturers"—a characterization that Gender severely disputes—Eidal's ability to bind Gender with respect to third parties was subject to ORS 68.210(1). That statute provides:

> "Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which the partner is a member binds the partnership, *unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom the partner is dealing has knowledge of the fact that the partner has no such authority.*" (Emphasis supplied.)

*See also Stone-Fox, Inc. v. Vandehey Development Co.*, 290 Or 779, 785-87, 626 P2d 1365 (1981) (ORS 68.210 applies to joint ventures; one joint venturer binds other joint venturers for acts within the scope of his or her agency authority.)

---

"(3) Except as stated in Subsections (1) and (2) and in § 311 or as provided by the contract, the right of any beneficiary against the promisor is not subject to the promisor's claims or defenses against the promisee or to the promisee's claims or defenses against the beneficiary.

"(4) A beneficiary's right against the promisor is subject to any claim or defense arising from his own conduct or agreement."

We are unaware of any Oregon authority expressly adopting the formulation set out in *Restatement (Second)* section 309.

Conversely, ADM relies on Ninth Circuit authority for the proposition that: "[g]enerally, a third-party beneficiary's rights are subject to any contract defense that the promisor could assert against the promisee, if the promisee were suing on the contract." *Carpenters Health & Welfare Trust v. Bla-Delco*, 8 F3d 1365, 1369 (9th Cir 1993).

Here, ADM knew, by virtue of its acceptance of the April 3 modification of the payment terms, that Eidal had no actual authority to request or receive nonjoint payment for the shredder. Thus, Eidal's conduct in that regard did not bind the alleged joint venture and preclude Gender's third-party recovery.

■ For the same reason, ADM's "agent for payment" argument fails: Eidal lacked either actual or apparent authority with respect to ADM to solicit and obtain sole payment. *See Badger v. Paulson Investment Co., Inc.*, 311 Or 14, 24, 803 P2d 1178 (1991) ("Apparent authority is created 'only by some conduct of the principal which, when reasonably interpreted, causes a third party to believe that the principal consents to have the apparent agent act for him on that matter[.]'" (quoting *Mattson v. Commercial Credit Business Loans*, 301 Or 407, 422, 723 P2d 996 (1986), quoting *Jones v. Nunley*, 274 Or 591, 595, 547 P2d 616 (1976))). The trial court correctly rejected ADM's payment defense.

Finally, with respect to the appeal, ADM's sixth, seventh, and eighth assignments of error pertain to causation of damage and measure of damages. We reject those assignments without further discussion.

Gender's cross-appeal challenges the trial court's reduction of its recovery by the $105,000 that Eidal "passed through" from the ADM payment and by the $16,349 prorated "share" of the Burda settlement. We affirm with respect to the $105,000 offset, but reverse with respect to the $16,349 offset.

■ Gender argues that the trial court erred in offsetting damages by $105,000 because, although ADM's $225,000 payment was the source of those funds, Eidal had several open accounts with Gender and Eidal did not "earmark" payment to the ADM account. As a result, Gender applied the money not to the ADM account, but to Eidal's older, non-ADM-related debts. Gender thus asserts that, given Eidal's lack of direction, it was entitled to apply the $105,000 to any account that it chose and that ADM remained liable for the full $225,000 contract price. ADM counters that, if Gender were correct, its total "in-pocket" recovery from ADM could be

as much as $330,000 ($225,000 plus $105,000), far exceeding the shredder's $225,000 price.

Gender relies on the principle that, when a debtor has several accounts with a creditor and the debtor makes a payment without identifying the debt to which it is to be applied, the creditor may apply the payment to any of the open accounts. *See Kincaid v. Fitzwater,* 257 Or 170, 173, 474 P2d 742 (1970); *Fatland v. Wentworth & Irwin,* 149 Or 277, 280-81, 40 P2d 68 (1935). Gender further relies on construction lien cases that, when a contractor has several accounts with a material supplier, the supplier "may not apply payment however it sees fit when it knows the source and the intended application of the funds paid." *Tri-City Bldg Center v. Stoneridge Dev. Co.,* 60 Or App 344, 349, 653 P2d 1012 (1982); *see also Moser Paper Co. v. North Shore Publishing Co.,* 83 Wis 2d 852, 266 NW2d 411, 415 (1978).

We do not agree with Gender that a reasoned application or extension of the authority it invokes compels the sort of double recovery it seeks here. That recovery—or, rather, Gender's rationale for that recovery—turns on the mere fortuity that Eidal, in passing through the $105,000, did not identify ADM as the source of those funds or direct that they be credited against the ADM project balance. Ironically, under Gender's approach, if Eidal had retained or squandered the entire $225,000, Gender would be worse off; that is, rather than reaping a total in-pocket recovery of $330,000, it could recover no more than $225,000. Conversely, if Eidal had actually passed ADM's entire $225,000 payment through to Gender, but had failed to identify ADM as the source of those funds, Gender's in-pocket recovery from ADM could be as much as $450,000. Contract law is not so whimsical. Gender's total recovery, including prior receipt of funds, from ADM cannot exceed its damages of $225,000. *See Zehr v. Haugen,* 318 Or 647, 658, 871 P2d 1006 (1994) (A plaintiff in a breach of contract action is entitled to be compensated only for the "loss incurred as a result of the defendant's breach. [T]hat compensation may be accomplished by placing the aggrieved party in the position that he or she would have occupied had the contract been fully performed[.]"). The trial court correctly reduced Gender's recovery by $105,000.

█ The $16,349 offset is considerably more convoluted. As described previously, Gender asserted claims against Eidal and the Burdas that were related to a variety of projects between the parties, including the ADM project. The most substantial of those other claims pertained to the Boeing litigation. Gender settled all of its claims against the Burdas and, in doing so, released the Burdas with respect to all claims, including those pertaining to the ADM shredder. Other parties to the Boeing litigation also settled as part of an omnibus settlement. Pursuant to the settlement agreement, the Burdas agreed to pay Gender $51,250 for claims, with that amount exclusively allotted to the Boeing-related claims. The settling parties explicitly provided that "[t]his Agreement is not intended by the parties, or any of them, to settle any claims or disputes against [ADM], or to operate as a release of ADM—or to provide any compensation to Gender on account of the ADM claims or disputes." The total amount of the settlement, including the Burdas' payment of $51,250, was less than Gender's alleged damages in the Boeing litigation, $281,917.95.

After learning of the settlement, ADM asked the trial court to apportion a prorated share of the Burdas' payment as an offset in the ADM litigation. Notwithstanding the express language of the settlement agreement, the trial court did so, apparently because of its concern that, in its view, there was no consideration given for Gender's release of the Burdas with respect to the ADM claim:

"THE COURT: It seems to be that it is quite clear from the settlement agreement that something was paid to Gender Machine in return for the release of that claim, and whatever that something is, that ADM is entitled to an offset in that amount. * * * And I would have to say that your—your attempted apportionment in the agreement, that that—yes, that is in bad faith, if you want to call it that. It is ineffective because obviously there was some consideration, or if there was not any consideration, then the ADM claims remain."

Gender asserts on cross-appeal that, far from evincing bad faith, the settlement agreement's allotment of the Burdas' payment was prudent and proper. Before addressing

the substance of that argument, it is useful to revisit the procedural posture of this case, that is, to remember what this case is—and what it is not.

This is not a case, like many "good faith" cases before the advent of proportionate fault statutes,[11] in which plaintiffs entered into "sweetheart" settlements with relatively high liability/low asset joint tortfeasors so as to increase their recovery against relatively low liability/"deep pockets" co-defendant joint tortfeasors.[12] Indeed, it is not even a tort case, at least with respect to ADM.[13] It is, instead, a breach of contract case, which, in combination with the Boeing litigation, involved two entirely distinct transactions in which the Burdas were involved. Nor is this a case of potential "double dipping," in which plaintiff, by manipulating the apportionment of settlement proceeds, could reap a recovery in excess of its actual loss. It is, rather, a case in which, even after all of the Burda payment is allotted to the Boeing litigation, plaintiff's total recovery still is less than its combined loss on the ADM and Boeing transactions.

Given those circumstances, we agree with Gender that there was nothing improper about the settlement

---

[11] *See, e.g.,* ORS 18.470. That statute provides, in part:

"(2) The trier of fact shall compare the fault of the claimant with the fault of any party against whom recovery is sought, the fault of third party defendants who are liable in tort to the claimant, *and the fault of any person with whom the claimant has settled.* * * *

"(3) A defendant who files a third party complaint against a person alleged to be at fault in the matter, or who alleges that a person who has settled with the claimant is at fault in the matter, has the burden of proof in establishing:

"(a) The fault of the third party defendant or the fault of the person who settled with the claimant; and

"(b) That the fault of the third party defendant or the person who settled with the claimant was a contributing cause to the injury or death under the law applicable in the matter."

*See also* ORS 18.455(1)(a); ORS 18.480(1)(b); ORS 18.485.

[12] *See, e.g., River Garden Farms, Inc. v. Superior Court for County of Yolo,* 26 Cal App 3d 986, 103 Cal Rptr 498, 504-06 (1972) (describing criteria for determining whether settlement with joint tortfeasor was entered into in good faith). *Accord Grillo v. Burke's Paint Co.,* 275 Or 421, 551 P2d 449 (1976) (generally addressing mechanics and propriety of "Mary Carter agreements/loan receipt settlements").

[13] Gender's claims against the Burdas and Eidal, with respect to both the ADM and Boeing matters, included a claim for fraud. Gender did not, however, assert any tort claims against ADM.

agreement's allotment of the Burda payments. At the time Gender settled with the Burdas, it knew that (1) even if the Burda payment was fully allotted to the Boeing claim, it would still not obtain a full recovery on that claim; and (2) if it established ADM's liability it would almost certainly, given ADM's solvency, secure a full recovery on the ADM claim. Thus, Gender was faced with a choice between allotting the Burda settlement completely to the Boeing claim, so as to maximize its total potential recovery or apportioning some or all of that settlement to the ADM claim and commensurately reducing its total potential recovery. Gender chose to maximize its potential recovery, rather than to minimize ADM's exposure. That choice was reasonable and appropriate.[14] We thus conclude that the trial court erred in granting ADM's motion to apportion the Burda settlement proceeds and in allowing an offset in the amount of $16,349.

Affirmed on appeal; on cross-appeal, reversed with respect to $16,349 offset and otherwise affirmed.

---

[14] An analogous hypothetical is instructive: Assume that (1) Gender, rather than settling with the Burdas, had proceeded to trial against them on both the Boeing and the ADM claims; (2) Gender then obtained a judgment against the Burdas for $280,000 on the Boeing claim and $225,000 on the ADM cl aim; and (3) the Burdas' total assets were $51,000. If Gender executed only on the Boeing judgment, and not on the ADM judgment, could a court compel Gender to execute against the Burdas on both judgments and to apportion any recovery between the two judgments? The answer is evident.